CV=06    4830

**STERN, ADLER & WEINSTEIN, LLP.**
1025 Old Country Road, Suite 305
Westbury, New York 11590
(516) 876-1106
Attorneys for Plaintiffs
Shalom S. Cohen individually and on behalf of
the Members of SAGDIANA, LLC.

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

SEP 06 2006

BROOKLYN OFFICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

Shalom S. Cohen individually and on behalf of
the Members of SAGDIANA, LLC.,

                 Plaintiffs,

-against-

Boris Mallayev, Moshe Mallayev, Nelly Ishakov,
Ester Tzegaegbe, SAGDIANA, LLC.,
Charles I. Pollack, Esq., Segal, Fryer, Shuster &
Lester, P.C. and Mikhail Mallayev,

                 Defendants.

---

CIVIL ACTION NO.:    GOLD. M.J.

**COMPLAINT**

---

    Plaintiff, Shalom S. Cohen, as fifty (50%) per cent Member of Sagdiana, LLC. on behalf

of himself and in the right of Sagdiana, LLC., complaining of the defendants,

respectfully alleges and shows this Court the following:

### THE PARTIES

    1. The plaintiff, Shalom Cohen was and is a fifty (50%) per cent Member of the

defendant, Sagdiana, LLC., and bring this action on his own behalf and on behalf of Sagdiana,

LLC. and for its benefit.

    2. Sagdiana, LLC. (hereinafter referred to as "Sagdiana"), is, and

was at all times hereinafter mentioned, a Limited Liability Company duly organized and existing

under and by virtue of the laws of the State of Georgia with its principal place of business being 3016 Henderson Mill Road, Atlanta, Georgia 30341. Sagdiana's registered office and registered agent are its attorney, Charles I. Pollack, Esq., 1050 Crown Pointe Parkway, Suite 410, Atlanta, Georgia 30338.

3. Upon information and belief, the individual defendants, Boris Mallayev, Moshe Mallayev, Nelly Ishakov and Ester Tzegaegbe comprise the remaining fifty (50%) per cent interest of Sagdiana, and by and through the assistance of the co-defendants, Charles I. Pollack, Esq. and Segal, Fryer, Shuster & Lester, P.C., have assumed control of Sagdiana's day to day activities and decision making processes. Since assuming control of Sagdiana, the defendants have exercised and asserted sole dominion and control of all Sagdiana's actions in total disregard of the plaintiffs' rights and in contravention of the interests of Sagdiana.

4. Upon information and belief, the individual defendant, Charles I. Pollack, Esq. is an attorney duly licensed to practice law in the State of Georgia, and the registered agent of Sagdiana. Said defendant conducts business at 1050 Crown Pointe Parkway, Suite 410, Atlanta, Georgia 30338 the registered office of Sagdiana.

5. Upon information and belief, the defendants, Segal, Fryer, Shuster & Lester, P.C., is a professional corporation duly organized and existing pursuant to the laws of the State of Georgia. The shareholders of said defendant are believed to be licensed to practice law in the State of Georgia, and one of its officers, directors and shareholders is the registered agent of Sagdiana. Said defendants conduct business at 1050 Crown Pointe Parkway, Suite 410, Atlanta, Georgia 30338 the registered office of Sagdiana.

6. Upon information and belief, the individual defendants, Mikhail Mallayev is an
individual residing in the State of Georgia and the guarantor of the certain loan made by Plaintiff,
Shalom S. Cohen to Sagdiana, LLC.

## JURISDICTION

7. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §
1332 in that this is an action between citizens of different states and the amount in controversy
exceeds $75,000.00, exclusive of interest and costs.

## BACKGROUND

8. By MEMBERSHIP INTEREST PURCHASE AGREEMENT, which became effective
January, 2006  plaintiff Shalom S. Cohen purchased fifty (50%) per cent membership interest in
SAGDIANA, LLC. See Exhibit "A".

9. Simultaneous therewith, the Members of SAGDIANA executed an AMENDED AND
RESTATED OPERATING AGREEMENT.  See Exhibit "B" attached.

10. Upon information and belief, the Members of SAGDIANA and their interest are as
follows:

| Shalom S. Cohen | 50% |
| Boris Mallayev | 25% |
| Moshe Mallayev | 10% |
| Nelly Ishakov | 10% |
| Ester Tzegaegbe | 5% |

11. The co-defendants, Charles I. Pollack, Esq. and Segal, Fryer, Shuster & Lester, P.C.
drafted said MEMBERSHIP INTEREST PURCHASE AGREEMENT and the AMENDED
AND RESTATED OPERATING AGREEMENT on behalf of SAGDIANA and all its Members.

12. By the AMENDED AND RESTATED OPERATING AGREEMENT, the co-defendant, Segal, Fryer, Shuster & Lester, P.C. held itself out to SAGDIANA's Members as the "COMPANY"S COUNSEL".

13. From time to time in or about January, 2006, defendants Charles I. Pollack, Esq. and Segal, Fryer, Shuster & Lester, P.C. drafted various versions of what became the final executed MEMBERSHIP INTEREST PURCHASE AGREEMENT and the AMENDED AND RESTATED OPERATING AGREEMENT on behalf of SAGDIANA and all its Members.

14. One or more of the earlier versions were executed by the individual Members of SAGDIANA. Thereafter, the parties continued to negotiate versions thereof until such time as final agreement had been arrived at. Upon agreement of the language contained in the final agreements, (Exhibits "A" and "B" attached hereto), defendants, Charles I. Pollack, Esq. and Segal, Fryer, Shuster & Lester, P.C. forwarded plaintiff, Shalom S. Cohen's prior counsel, Benzion Frankel, Esq., an e-mail communication authorizing him to "substitute signature pages" and directing that plaintiff, Cohen wire the final $1.2 Million Dollar purchase price to Sagdiana's previously designated bank account. See Exhibit "C".

15. Plaintiff, relying on Sagdiana's counsels' instructions wired the $1.2 Million Dollars in completion of the purchase of his fifty (50%) per cent interest in Sagdiana.

16. Among other things represented to plaintiff by all defendants herein, was that Sagdiana was the 100% owner of SAGDIANA II, LLC. and its 131 residential unit project more commonly known as "Sugar Hill Overlook" and its 66.7% interest in Village Concepts, LLC. The defendants further represented to plaintiff that Village Concepts, LLC. was the contract vendee of 100 acres in Georgia, a material inducement to plaintiff entering into the within transaction.

17. Since paying the purchase of price of $1.5 Million Dollars, plaintiff has discovered that Sagdiana's money has been misappropriated by one or more of the other Members of Sagdiana, that Sagdiana has diverted money to purchase the aforementioned 100 acres in an entity that Sagdiana has no ownership interest in, and that one or all of the defendants are claiming that the MEMBERSHIP INTEREST PURCHASE AGREEMENT and the AMENDED AND RESTATED OPERATING AGREEMENT were never executed by the defendant.

18. Plaintiff, brings this action accordingly, to recover Sagdiana's money so misappropriated, it's interest in the 100 acres and or the return of plaintiff's $1.5 Million Dollars with damages.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST

## ALL DEFENDANTS

19. Plaintiff, by its counsel herein has duly inquired of the circumstances complained of herein. See Exhibit "D" attached. In response thereto, the defendants have "questioned" whether in fact the Agreements attached hereto as Exhibits "A" and "B" have ever been executed. See Exhibit "E" attached.

20. By forwarding the letter authorizing the substitution of the signatures pages and demanding the wire of $1.2 Million Dollars, the MEMBERSHIP INTEREST PURCHASE AGREEMENT and the AMENDED AND RESTATED OPERATING AGREEMENT became valid binding Agreements between all parties herein.

21. Plaintiff seeks a Declaratory Judgment wherein and whereby said Agreements are declared, duly executed, valid and binding Agreements by and between all parties herein.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST

## ALL DEFENDANTS

22. Plaintiff repeats, restates and reiterates each and every allegation contained in paragraphs "1" through "21" above as though more fully set forth below.

23. By forwarding the confirmation and instruction letter attached hereto as Exhibit "C", the defendants knew or should have known that plaintiff would rely on the same in forwarding the $1.5 Million Dollars.

24. In the event the Agreements are found to have not been executed or are not legally binding, the defendants have fraudulently induced plaintiff into forwarding the $1.5 Million Dollars the return of which is sought herein together with interest thereon.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST

## ALL DEFENDANTS

25. Plaintiff repeats, restates and reiterates each and every allegation contained in paragraphs "1" through "24" above as though more fully set forth below.

26. By the AMENDED AND RESTATED OPERATING AGREEMENT plaintiff, Shalom S. Cohen and defendant, Boris Mallayev were named the Managers of Sagdiana. In connection therewith, the Managers were authorized to open a bank account on behalf of Sagdiana

27. By the terms of the AMENDED AND RESTATED OPERATING AGREEMENT, plaintiffs signature or agreement was required in all banking transactions of Sagdiana. Specifically, paragraph 5.06 states:

"BANK ACCOUNTS. The Managers may from time to time open bank accounts in the name of the Company, and the Managers shall be the sole signatories thereon, with only one Managers signature being required, ***provided the written consent of the other Manager has been obtained, or unless the Members determine otherwise.***" (Bold, underline and italics emphasis added).

28. Attached hereto as Exhibit "F" is the Sagdiana bank statement evidencing all credits and debits between December 30, 2005 and March 2, 2006. The same evidences plaintiff's transfer of $1.5 Million Dollars.

29. Not one expenditure was signed for plaintiff or in the alternative, authorized by him writing, in direct contravention of Sagdiana's AMENDED AND RESTATED OPERATING AGREEMENT.

30. Upon information and belief, the defendants have misappropriated and otherwise converted plaintiff and Sagdiana's for the own purposes and uses. Plaintiff seeks the return of all such money converted and misappropriated together with statutory interest thereon from January 13, 2006.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST

## ALL DEFENDANTS

31. Plaintiff repeats, restates and reiterates each and every allegation contained in paragraphs "1" through "30" above as though more fully set forth below.

32. By Plaintiff's counsel's letter dated August 25, 2006, Plaintiff has duly demanded an itemized statement evidencing detailed expenditures of Sagdiana's money on deposit since Plaintiff became a Member of Sagdiana. To date, each defendant has wilfully and intentionally failed to provide said information. See Exhibit "G" attached.

33. As a result of the foregoing, plaintiff demand a full accounting of Sagdiana's books and records to determine those monies, misappropriated and converted by the defendants herein, and upon such determination, plaintiff demand the return of said monies together with statutory interest thereon from the date so misappropriated and actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST
### ALL DEFENDANTS

34. The Plaintiffs repeat, restate and reiterate, each and every allegation contained in paragraphs "1" through "33" above as though more fully set forth below.

35. That since the defendants assumed control of Sagdiana by virtue of holding a Managers position, being a signatory on the bank account and constituting fifty (50%) per cent of the voting interest in Sagdiana, the defendants have consistently acted in their self interest and to the detriment of the Sagdiana and its other Members.

36. The defendants have engaged in a common plan and scheme to waste corporate assets and opportunities and have undertaken and implemented decisions which preclude Sagdiana from realizing or enjoying actual or maximum profits from its operations. Said actions include but are not limited to the inferior and incompetent running of the day to day operation of Sagdiana as well as its financial decisions including the mismanagement of monies and banking operations.

37. The controlling defendants have preferred their self-interest in violation of their fiduciary obligations owed Sagdiana and its Members, electing instead to receive personal benefits including remuneration to themselves.

38. The actions of the defendants in running the day to day operations of Sagdiana constitute gross mismanagement and misconduct. The defendants have failed to exercise due care, skill and diligence in conducting the affairs of Sagdiana and have wasted its assets and business opportunities accordingly.

39. By reason of the foregoing, the defendants have conspired with each other and aided and abetted the breach of fiduciary duties owed to Sagdiana and its Members. The exact amount of said damages and benefits is unknown to plaintiff and cannot be ascertained except by an accounting herein. Upon such determination, plaintiff demand the return of said monies together with statutory interest thereon from the date so misappropriated and actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS.

40. Plaintiff has made no demand on the other Members of Sagdiana to take action with respect to the wrongs herein alleged since fifty (50%) per cent of Sagdiana's Members participated in, authorized, and approved the acts and transactions complained of herein and are liable therefor. Said Members are defendants in this action. They cannot be expected to vote to prosecute an action against themselves. By reason of the foregoing, such demand would be futile and is therefore unnecessary.

41. Plaintiffs have no adequate remedy at law.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST

## ALL DEFENDANTS

42. The Plaintiffs repeat, restate and reiterate, each and every allegation contained in paragraphs "1" through "41" above as though more fully set forth below.

43. Upon information and belief, the defendants have facilitated and participated in the

purchasing of an approximate 100 acre parcel in a name other than Sagdiana or its related affiliates, by and including the use of Sagdiana's money to make such purchase. The 100 acre parcel was heretofore identified as a business opportunity of Sagdiana.

44. Each of the defendants knew or should have known that the purchase of the 100 acre parcel or any portion thereof in an unrelated entity of Sagdiana constitutes theft and/or diversion of Sagdiana's money and business opportunities.

45. As such, each of the defendants has exposed Sagdiana and its Members to the potential loss of millions of dollars of lost profits. In addition, each of the defendants have violated and breached their fiduciary duties owed Sagdiana and its Members.

46. Plaintiff seeks a declaratory judgment wherein and whereby all such property acquired is declared the property of Sagdiana and that each of the defendants should be made to pay damages to the plaintiffs with statutory interest thereon from the date so determined, by way of actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST

## ALL DEFENDANTS

47. The Plaintiffs repeat, restate and reiterate, each and every allegation contained in paragraphs "1" through "46" above as though more fully set forth below.

48. Each of the defendants is charged with the fiduciary duty of insuring that honest, diligent and skilled persons are employed to run Sagdiana's operations.

49. The defendants, as majority voting Members, were able at all times since plaintiff purchase into Sagdiana, to determine and direct, the business policies and affairs of Sagdiana and they otherwise have had complete and exclusive control of Sagdiana.

50. That it was the fiduciary duty of the defendants, to manage, direct and administer diligently and carefully the affairs of Sagdiana and to safeguard the property and business opportunities of Sagdiana and to prevent company assets from being wasted, squandered and/or stolen.

51. Each of the defendants acts facilitated and contributed to the wasting of corporate assets and business opportunities of Sagdiana.

52. As a result of the foregoing, plaintiffs demand a full accounting of Sagdiana's books and records to determine those monies, bonuses, expenses and other forms of renumeration  paid by Sagdiana and those business opportunities lost by Sagdiana, and upon such determination, plaintiffs demand judgment against the defendants herein together with statutory interest thereon from the date so misappropriated and actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS.

## AS AND FOR A EIGHTH CAUSE OF ACTION AGAINST

## ALL DEFENDANTS

53. Plaintiff repeats, restates and reiterates each and every allegation contained in paragraphs "1" through "52" above as though more fully set forth below.

54. The misappropriation and conversion of Sagdiana's money and business opportunities by the defendants have continued to the present time and will continue in amounts unknown to plaintiff. Unless restrained, the defendants will continue to convert Sagdiana's money and divert it business opportunities for themselves to the detriment of plaintiff and Sagdiana.

55. Any demand upon the Members to bring action against the defendants for the wrongs complained of herein would be futile, since they are the wrongdoers, and they are in fifty (50%)

control of the interest in Sagdiana and constitute enough voting power of Sagdiana to prevent plaintiff from taking action to protect Sagdiana.

56. As a result of the actions complained of herein, the plaintiff request that those defendants who are Members of Sagdiana be removed as Manager and/or have their interest declared non-voting and thereafter be permanently enjoined from holding positions as Manager of Sagdiana and/or participating in the voting class of Sagdiana.

### AS AND FOR A NINTH CAUSE OF ACTION AGAINST

### THE DEFENDANTS CHARLES I. POLLACK, ESQ.

### AND SEGAL, FRYER, SHUSTER & LESTER, P.C.

57. Plaintiff repeats, restates and reiterates each and every allegation contained in paragraphs "1" through "56" above as though more fully set forth below.

58. Defendants Pollack and SFSL are the "COMPANY COUNSEL" of SAGDIANA as self identified in Sagdiana's AMENDED AND RESTATED OPERATING AGREEMENT. In there capacity as such, they are charges with duties and obligations all attorneys commonly owe their clients including but not limited to protecting against any conflicts of interest between respective clients and protecting all of the Members' interests and insuring that no Member usurp's the business opportunities of the Company.

59. Upon information and belief, while acting as Sagdiana's and Plaintiff's counsel (as fifty 50% per cent of Sagdiana), defendants, CHARLES I. POLLACK, ESQ. AND SEGAL, FRYER, SHUSTER & LESTER, P.C. represented an unknown entity in the purchase of a parcel of land said attorneys previously represented to plaintiff, that Sagdiana was contract vendee of.

60. Upon information and belief defendants, CHARLES I. POLLACK, ESQ.

AND SEGAL, FRYER, SHUSTER & LESTER, P.C. knew or should have known that the money used to purchase said 100 acre parcel or any portion thereof, was the money of Sagdiana.

61. Defendants, CHARLES I. POLLACK, ESQ. AND SEGAL, FRYER, SHUSTER & LESTER, P.C. conspired with the defendant, Members of Sagdiana to the detriment of Plaintiff and Sagdiana. Amongst other things, while acting as Sagdiana and Plaintiff's counsel as its 50% Member, defendants CHARLES I. POLLACK, ESQ. AND SEGAL, FRYER, SHUSTER & LESTER, P.C. learned the identity of the entity the 100 parcel or a portion thereof were purchased in however the defendants, CHARLES I. POLLACK, ESQ. AND SEGAL, FRYER, SHUSTER & LESTER, P.C. refuse to disclose said information to Plaintiff.

62. As a result, defendants, CHARLES I. POLLACK, ESQ. AND SEGAL, FRYER, SHUSTER & LESTER, P.C. breached their fiduciary duties owed plaintiff and Sagdiana for which each has been damaged in an amount to be determined by the Court, an amount plaintiffs for which plaintiff demands judgment against the defendants herein together with statutory interest thereon from the date said acts occurred and actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS.

<u>AS AND FOR A TENTH CAUSE OF ACTION AGAINST</u>

<u>THE DEFENDANT MIKHAIL MALLAYEV</u>

63. Plaintiff repeats, restates and reiterates each and every allegation contained in paragraphs "1" through "62" above as though more fully set forth below.

64. As further inducement to plaintiff investing the $1,500,000.00 heretofore detailed, defendant Mikhail Mallayev did personal guaranty the repayment of this investment. See the Personal Guaranty attached hereto as Exhibit "H".

65. Upon information the defendants have acted in concert to defraud plaintiff and convert the $1,500,000.00 invested in Sagdiana.

66. As a result, plaintiff demands the return of all such monies invested in Sagdiana together with statutory interest thereon from January 13, 2006.

WHEREFORE, plaintiffs demand judgment for which plaintiffs, inclusive of SAGDIANA, LLC. have sustained by reason of matters heretofore stated, as may be ascertained and determined, and that the defendants be adjudged and decreed to pay and restore the amount of said damages to SAGDIANA, LLC as each of them has wrongfully gained and received, and that all monies, properties or profits gained and received from SAGDIANA, LLC. by the defendants, by reason of the acts complained of herein, be adjudged to be held in trust for SAGDIANA, and for its benefit, and that the plaintiffs recover the following:

1. On the first cause of action, for a Declaratory Judgment adjudging that the MEMBERSHIP INTEREST PURCHASE AGREEMENT and the AMENDED AND RESTATED OPERATING AGREEMENT be and the same hereby are binding Agreements between all parties herein;

2. On the second cause of action, in the event the Agreements are not found to binding valid Agreements, for the return of all monies paid to and on behalf of SAGDIANA together with actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS as a result of the defendants fraudulently inducing Plaintiff to wire and otherwise pay over to the defendants, One Million Five Hundred Thousand Dollars;

3. On the third cause of action, for the return of all money converted and misappropriated by the defendants together with statutory interest thereon from January 13, 2006.;

4. On the fourth cause of action, for a full accounting of SAGDIANA's books and records to determine those monies, misappropriated and converted by the defendants herein, and upon such determination, plaintiff demand the return of said monies together with statutory interest thereon from the date so misappropriated and actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS;

5. On the fifth cause of action for an award based upon the defendants conspiring with each other and having aided and abetted each other to the breach the fiduciary duties owed to SAGDIANA and its Members. The exact amount of said damages and benefits is unknown to plaintiff and cannot be ascertained except by an accounting herein. Upon such determination, plaintiff demand the return of said monies together with statutory interest thereon from the date so misappropriated and actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS.

6. On the sixth cause of action for a full accounting of SAGDIANA's books and records to determine those monies, bonuses, expenses and other forms of renumeration  paid by SAGDIANA and those business opportunities lost by SAGDIANA, and upon such determination, plaintiffs demand judgment against the defendants herein together with statutory interest thereon from the date so misappropriated and actual, punitive and exemplary damages in an amount to be determined by the Court, an amount the plaintiffs believe to be in excess of FIVE MILLION DOLLARS.

7. On the seventh cause of action for an Order Removing Boris Mallayev as Manager of SAGDIANA and an Order barring Boris Mallayev, Moshe Mallayev, Nelly Ishakov, Ester Tzegaegbe  from holding positions as Members of SAGDIANA, LLC. and simultaneously

permanently enjoining the said defendants from participating in the voting class of SAGDIANA;

8. On the eighth cause of action against for the removal of Boris Mallayev as a Manager of Sagdiana and for an Order permanently barring any defendant from holding such a position;

9. On the ninth cause of action for against the defendants Charles I. Pollack, Esq. and Segal, Fryer, Shuster & Lester, P.C. for malpractice, breach of fiduciary duty and loyalty and conflict of interest;

10. On the tenth cause of action for against the defendant Mikhail Mallayev for the return of plaintiff's $1,500,000.00 together with interest thereon from January 13, 2006;

11. For the costs and disbursements of this action including reasonable attorneys fees, and

12. For other and further relief as to this Court seems just and proper.

Dated: Westbury, New York
September 5, 2006

Yours, etc,
Stern, Adler & Weinstein, LLP.

By: Steven M. Weinstein, Esq.(SMW8353)
Attorney for Plaintiffs
Shalom S. Cohen individually and on behalf
of the Members of SAGDIANA, LLC.
1025 Old Country Road, Suite 305
Westbury, New York 11590
(516) 876-1106

c:\s&csagdiana

## VERIFICATION

STATE OF NEW YORK    )
COUNTY OF NASSAU    ) ss.:

     Shalom S. Cohen, being duly sworn deposes and says:

     Deponent is the individual plaintiff and Managing Member of Sagdiana, LLC. the

plaintiff company in the within proceeding; that deponent has read the Summons and Complaint,

the contents thereof; that the same is true to deponent's own knowledge except as to those

matters therein stated to be alleged on information and belief, and as to those matters, deponent

believes them to be true.

                                   Shalom S. Cohen

Sworn to before me on this
the 5th day of September, 2006.

Notary Public

STEVEN M. WEINSTEIN
Notary Public, State of New York
No. 02WE4846024
Qualified In Nassau County
Commission Expires October 31, 20 07

Exhibit A

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Agreement is made and effective as of this _____ day of January, 2006 (the "Effective Date"), by and among Sagdiana, LLC, a Georgia limited liability company (the "Seller" or the "Company"), and Shalom S. Cohen ("Cohen"), an individual resident of the State of New York  (the "Buyer").

## WITNESSETH:

WHEREAS, the Company is willing to sell to Buyer a fifty percent (50%) membership interest in the Company, and Buyer is willing to purchase such membership interest in the Company on the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, conditions, warranties and representations contained herein, and for other valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Purchase of and Payment for Membership Interests and Economic Interests. (a) On the Closing Date, Buyer shall purchase from the Company the following membership interest in the Company, and the Company shall sell and deliver to Buyer a fifty percent (50%) membership interest in the Company (the "Membership Interests").

(b) On the Closing Date, the Company shall transfer and assign to Buyer fifty percent (50%) of their Economic Interest (as said term is defined in the Company's Operating Agreement) in the Company.

(c) By execution hereof, the Company, its managers and members, hereby consent to the transfer of the Membership Interests as contemplated hereby, and waive any the transfer restrictions which may be set forth in the Company's Operating Agreement.

2. Purchase Price and Allocation. The Purchase Price for the Membership Interests shall be One Million, Five Hundred Thousand and No/100 Dollars ($1,500,000.00) paid as follows: $300,000.00 has been paid prior to the date hereof, and the balance shall be paid on or before January 13, 2006. All such payments shall be made by federal funds wire transfer to an account designated by the Company.

3. Closing Date. (a) The closing of the sale and purchase of the Membership Interests (the "Closing") shall take place at 1:30 p.m. at the offices of Segal, Fryer, Shuster & Lester, P.C. on or before the Effective Date or at such other place, date and time as may be practical as the parties may otherwise agree. The date upon which Closing shall occur is referred to as the "Closing Date."

(b) At Closing, Seller shall deliver the Membership Interests to Buyer.

(c)  At Closing, Buyer shall deliver to Seller the Purchase Price for the Membership Interests in accordance with Section 2 of this Agreement, and shall execute an Amended and Restated Operating Agreement of the Company.

4.  Representations and Warranties of Seller.  Seller hereby represents and warrants the following to Buyer:

(a)  Authorization.  This Agreement constitutes a valid and binding obligation of Seller, enforceable against Seller in accordance with the terms stated herein.  Seller has the right, power and capacity to sell, transfer and deliver the Membership Interests in accordance with the terms of this Agreement.

(b)  No Conflict.  To the best of Seller's knowledge and belief, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will violate, be in conflict with, or will constitute a default (or an event which, with notice or lapse of time or both, will constitute a default) under any statute, judgment, decree, order, regulation or rule of a court or other governmental agency applicable to Seller.  Other than the Company's Operating Agreement, Seller has not entered into any option, warrant, call or other agreement, commitment or understanding, whether fixed or contingent, that directly or indirectly (i) calls for the sale, pledge, encumbrance or other disposition of any Membership Interests or the grant of other rights relating to such Membership Interests, or (ii) regulates the voting or control of such Membership Interests or other equity interests of the Company.

(c)  Ownership of Membership Interests.  The payment to Seller of the Purchase Price, will result in Buyer's immediate acquisition of record ownership of the Membership Interests, free and clear of all liens and encumbrances, other than created hereby or connection with the transactions herein.

(d)  No Brokers.  Seller has not employed any broker or finder nor incurred any liability for any broker or finders fees or commissions or similar payments in connection any of the transactions contemplated by this Agreement.

(e)  Ownership of Property.  The Company's wholly-owned subsidiary, Sagdiana II, LLC, owns certain real property commonly known as "Sugar Hill Overlook" in accordance with a deed recorded in Deed Book 43207, Page 147, Gwinnett County, Georgia Records.  The only encumbrances upon said real property are those noted within the owner's title insurance policy issued in connection with acquisition of the said property, being First American Title Insurance Company Policy Number FA-31-884533. Additionally, the Company owns a two-thirds (2/3) interest of Village Concepts, LLC, a Georgia limited liability company.

-2-

(f) <u>No Additional Representations</u>. Seller has not made any (nor be deemed to have made any) representations or warranties to Buyer except as expressly provided in this Agreement.

5. <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants the following to Seller:

(a) <u>No Brokers</u>. Buyer has not employed any broker or finder or incurred any liability for any broker or finder's fees or commissions for similar payments in connection any of the transactions contemplated by this Agreement.

(b) <u>Authority</u>. The execution, delivery and performance of this Agreement and the transaction contemplated hereby are enforceable against Buyer in accordance with its terms.

(c) <u>Familiarity</u>. Buyer is familiar with the Company's business, and has had full access and opportunity to independently review, investigate and examine all books, records, documents, and other materials relevant to the transaction contemplated hereby.

(d) <u>Investment Purpose</u>. Buyer is acquiring the Membership Interests for Buyer's own account for investment purposes only and not with a view to, or for resale in connection with, any distribution of such securities within the meaning of the Georgia Securities Act, as amended, or the Securities Act of 1933, as amended, and Buyer does not presently intend to resell, assign, or otherwise dispose of all or any part of or the securities to be acquired hereunder. Buyer acknowledges that any certificates representing the Membership Interests will contain a legend indicating that said Membership Interests are issued in reliance on the exemption provided by the Georgia Securities Act, as amended, and prohibiting further transfer, sale or conveyance of such securities until such securities may, in the opinion of counsel to the issuer, be so transferred, sold or conveyed without a violation of any state or federal securities law.

(e) <u>Violation of Applicable Law</u>. The execution, delivery and performance of this Agreement and the transactions contemplated hereby will not violate any, statute, rule, regulation, order, injunction or decree of any court or government agency or instrumentality applicable to Buyer, or any agreement to which Buyer is a party and may be bound.

(f) <u>No Additional Representations</u>. Buyer has not made any (nor be deemed to have made any) representation or warranty to Seller except as expressly provided in this Agreement.

6. <u>Further Assurances</u>. At Closing, and from time to time thereafter, Buyer and Seller shall do all such additional and further acts, and shall execute and deliver all such additional and further affidavits, instruments, certificates and documents, as Seller, Seller's counsel, Buyer or Buyer's counsel may reasonably require fully to vest in and assure to

-3-

Buyer full right, title and interest in and to the Membership Interests to the full extent contemplated by this Agreement and otherwise to effectuate the purchase and sale of the Membership Interests as contemplated by and provided for in this Agreement, and to more fully perform the obligations of each party hereunder. The foregoing shall be deemed to include the provision of documentation and financial information with respect to the Company's business operations.

7. Nature and Survival of Representations and Warranties. All representations and warranties that the parties make in this Agreement shall be deemed to have been made at the Closing and shall then be true, and said representations and warranties, shall merge into the documentation transferring the Membership Interests at Closing.

8. Amendment and Termination. Neither this Agreement nor any provisions hereof shall be changed, discharged or terminated except by an instrument in writing that all the parties who are signatories hereto sign.

9. Assignment. This Agreement may not be assigned by Buyer without the prior written consent of Seller, which consent may be unreasonably withheld.

10. Binding Effect. All of the terms covenants, agreements and conditions herein contained shall be binding upon and inure to the benefit of each of the parties hereto, and their respective heirs, successors and permitted assigns.

11. Waiver of Breach. The waiver by either party of a breach of any portion of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach.

12. Entire Agreement. This instrument contains the entire agreement of the parties hereto concerning the subject matter hereof, and the terms of any letter of intent with respect to the sale to Buyer of the Membership Interests are hereby merged herein. This Agreement may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

13. Paragraph Headings. The paragraph headings contained in this Agreement are for reference purposes only and shall under no circumstances affect the meaning or interpretation of this Agreement.

14. Applicable Law. This Agreement shall be governed and controlled by the laws of the State of Georgia, regardless of the laws that might be applied under principles of conflicts of law, to the extent not otherwise preempted by federal law..

15. Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect its other provisions, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

-4-

16. Notices. All notices and other communications under or in connection with this Agreement shall be in writing and shall be deemed to have been duly given when hand delivered or when mailed, postage prepaid, by certified mail, return receipt requested and addressed as follows:

If to Seller :

Sagdiana II, LLC
3016 Henderson Mill Road
Atlanta, Georgia 30341

With a copy to:

Charles I. Pollack, Esq.
Segal, Fryer, Shuster & Lester, P.C.
Suite 410
1050 Crown Point Parkway
Atlanta, Georgia   30338

If to Buyer:

Shalom S. Cohen

With a copy to:

Benzion Frankel, Esq.
Suite 400
1716 Coney Island Avenue
Brooklyn, New York   11230

17. Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

18. Delivery by Facsimile. A facsimile transmission of this Letter of Intent shall be as valid as if the original, and the undersigned hereby stipulates that each signature hereon shall be deemed to be an "electronic signature" within the meaning of the Georgia Electronic Records and Signature Act, O.C.G.A. § 10-12-1, *et seq.*

19. Attorneys Fees. In any action or proceeding brought by a party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover the reasonable

[Continued on Next Page]

-5-

costs and expenses incurred by it in connection with that action or proceeding including, but not limited to, attorneys fees.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

**SELLER:**                                    **BUYER:**

SAGDIANA, LLC

By: _Boris Mallayev_
     Boris Mallayev, Manager

_____
Shalom S. Cohen

**Members of the Company**
(for purposes of granting consent)

_Boris Mallayev_
Boris Mallayev

_Moshe Ishakov_
Moshe Ishakov

_Nelly Ishakov_
Nelly Ishakov

_____
Ester Tzegaegbe

EXP 12.25.07

-6-

**Exhibit B**

## AMENDED AND RESTATED OPERATING AGREEMENT
### OF
### SAGDIANA, LLC
a Georgia limited liability company

THE SECURITIES DESCRIBED IN THIS OPERATING AGREEMENT HAVE NOT
BEEN REGISTERED UNDER THE GEORGIA SECURITIES ACT OF 1973, AS
AMENDED, IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION
SET FORTH IN SECTION 10-5-9(13) OF SUCH ACT.  IN ADDITION, THE
SECURITIES DESCRIBED IN THIS OPERATING AGREEMENT HAVE NOT
BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND
EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION FROM
REGISTRATION SET FORTH IN THE SECURITIES ACT OF 1933 PROVIDED BY
SECTION 4(2) THEREOF, NOR HAVE THEY BEEN REGISTERED WITH THE
SECURITIES COMMISSION OF CERTAIN STATES IN RELIANCE UPON
CERTAIN EXEMPTIONS FROM REGISTRATION.   THE SECURITIES
DESCRIBED IN THIS OPERATING AGREEMENT HAVE BEEN ACQUIRED FOR
INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE,
PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN
COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS OPERATING
AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM
REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE
REGISTRATION STATEMENT UNDER SUCH ACTS.

### ARTICLE I
### DEFINITIONS

The following terms used in this Operating Agreement shall have the
following meanings (unless otherwise expressly provided herein):

1.01   "Accounting Period."  The "Year of the Company", as defined in
Section 1.27 below, or, if agreed by all the Members (i) any other period ending with a
variation of a Member's Membership Interest in the Company or (ii) any other period for
which separate accounting is appropriate.

1.02   "Act." The Georgia Limited Liability Company Act (O.C.G.A. Section
14-11-100, et seq.).

1.03   "Articles of Organization." The Articles of Organization of Sagdiana,
LLC, as filed with the Secretary of State of Georgia, as the same may be amended from time
to time.

1.04    "Affiliate." (i) in the case of an individual, any relative of such Person; (ii) any officer, director, trustee, partner, manager, employee or holder of ten (10%) percent or more of any class of the voting securities of or equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee or holder of ten (10%) percent or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

1.05    "Capital Account." A capital account maintained in accordance with this Section 1.05. Separate Capital Accounts shall be maintained for each Member, and the amount of such Capital Account, as of any particular date, shall be the sum of the following amounts:

(i)    The aggregate amount of cash that has been contributed by or on behalf of such Member to the capital of the Company as of such date; plus

(ii)    The net fair market value of any property that has been contributed by or on behalf of such Member to the capital of the Company as of such date; plus

(iii)    The cumulative amount of the Company's Net Profit that has been allocated to such Member under Sections 10.01, 10.03, 10.04 and 10.05 hereof as of such date; minus

(iv)    The cumulative amount of the Company's Net Loss that has been allocated to such Member under Section 10.02, 10.03, 10.04 and 10.05 hereof as of such date; and minus

(vi)    The cumulative amount of cash and the net fair market value of all other property that has been distributed to such Member by the Company under Sections 11.01 and 15.03 hereof as of such date.

In computing a Member's Capital Account as of any particular date in the manner provided in this Section 1.05, any Net Profit of the Company for any Accounting Period ending on or before such date that is required to be allocated to the Members under Section 10.01 hereof and any Net Loss incurred by the Company for any Accounting Period ending on or before such date that is required to be allocated to the Members under Section 10.02 hereof shall be allocated to the Members in the manner provided in said Sections and shall be taken into account in the manner provided in this Section 1.05 in computing a Member's Capital Account. The intent of this Section is to maintain the Capital Account of each Member in accordance with the provisions of Treasury Regulations Section 1.704-1(b) and shall be interpreted consistently therewith.

- 2 -

1.06   "Capital Contribution."   Any contribution, as defined in O.C.G.A. Section 14-11-101(4), by a Member to the capital of the Company, in cash or property, whenever made.

1.07   "Code."   The Internal Revenue Code of 1986, as now or hereafter amended.

1.08   "Company."   Sagdiana, LLC

1.09   "Distributable Cash."   All cash receipts of the Company, including any cash proceeds realized from the sale or disposition of all or substantially all, or any portion, of the assets of the Company and any cash proceeds realized from any financing or refinancing, less (i) the amount necessary for the repayment of all of the Company's debts which are due and payable, including but not limited to debts to Members for loans to the Company, (ii) all cash expenditures (including expenditures for capital improvements) incurred incident to the normal organization and operation of the Company, and (iii) such Reserves as the Managers deem reasonably necessary to the proper operation of the Company's business in accordance with Section 1.22 below.   Depreciation and other non-cash charges shall not be considered in determining Distributable Cash.   Any reductions of Reserves shall also be added to Distributable Cash.

1.10   "Economic Interest."   A Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

1.11   "Economic Interest Owner."   The owner of an Economic Interest who is not a Member.

1.12   "Entity."   Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

1.13   "Initial Capital Contribution."   The initial contribution to the capital of the Company made by a Member pursuant to Section 9.01 of this Operating Agreement.

1.14   "Majority Interest."   Ownership Interests of Members which, taken together, exceed fifty (50%) percent of the aggregate of all Ownership Interests.

1.15   "Manager" or "Managers."   Two or more managers designated pursuant to this Operating Agreement.   Specifically, Manager shall mean both Boris Mallayev and Shalom S. Cohen, or any other person that succeeds any of such persons in the capacity as Manager.

- 3 -

1.16   "Member."  Each party who executes a counterpart of this Operating Agreement as a Member and each party who may hereafter become a Member.  To the extent a Manager has purchased a Membership Interest in the Company, he or she will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent he or she has purchased such Membership Interest in the Company.  If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest or another Membership Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

1.17   "Membership Interest."  A Member's entire interest in the Company, including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Act.

1.18   "Net Profit" and "Net Loss."   The Company's taxable income or taxable loss for any Accounting Period as determined under Section 703(a) of the Code, and Treasury Regulations Section 1.703-1, but with the following adjustments:

(i)   Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this Section shall be added to such taxable income or loss;

(ii)   Any expenditures of the Company described in Code Section 705(a)(2)(b) or treated as such expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this Section 1.18 shall be subtracted from such taxable income or loss;

(iii)   Gain or loss resulting from any disposition of Company property, and depreciation or amortization with respect to such property, which was credited to the Capital Account of a Member (as a result of the contribution of such property, a revaluation pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f), or as otherwise required by the Regulations) at a value different from the property's tax basis shall be computed with reference to such value notwithstanding that such value differs from the adjusted tax basis of such property;

(iv)   In the event of any distribution of Company property, or any adjustment described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), the amount of any adjustment described in Treasury Regulations Section 1.704-1(b)(2)(iv)(e) or (f) shall be added to or subtracted from such taxable income or loss; and

(v)   Any items specially allocated pursuant to Sections 10.03 through 10.05 hereof shall not be taken into account in computing Net Profit or Net Loss.

- 4 -

If the Company's taxable income or taxable loss for such Accounting Period, as adjusted in the manner provided above and in ARTICLE X below, is a positive amount, such amount shall be the Company's Net Profit for such Accounting Period; and if negative, such amount shall be the Company's Net Loss for such Accounting Period.

1.19   "Operating Agreement."   This Operating Agreement as originally executed and as amended from time to time.

1.20   "Ownership Interest."   The proportion that a Member's ownership interestMembership Interest in the Company bears to the aggregate ownership interestsMembership Interest of all Members.   The initial Ownership Interests of the Members are as follows:

| Member | Ownership Interest |
|---|---|
| Boris Mallayev | 25 % |
| Moshe Ishakov | 10 % |
| Nelly Ishakov | 10% |
| Ester Tzegaegbe | 5% |
| Shalom S. Cohen | 50% |

1.21   "Person."   Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

1.22   "Property."   That all property owned by the Company, including the Company's interest in Sagdiana II, LLC, a Georgia limited liability company and the Company's two-thirds (2/3) interest in Village Concepts, LLC, a Georgia limited liability company. The real property owned by Sagdiana II, LLC is commonly known as "Sugar Hill Overlook" and was acquired by deed recorded Deed Book 43207, Page 147, Gwinnett County, Georgia Records.   The only encumbrances upon said real property are those noted within the owner's title insurance policy issued in connection with acquisition of the said property, being First American Title Insurance Company Policy Number FA-31-884533. The Company shall use its best efforts to cause Sagdiana II, LLC to commence construction of the improvements upon the Sugar Hill Overlook property on or before January 10, 2006.

1.23   "Reserves."   With respect to any Accounting Period, funds set aside or amounts allocated for such period to reserves maintained in amounts deemed sufficient by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

1.24   "Supermajority Interest".   Ownership Interests of Members which, taken together, exceed sixty-seven (67%) percent of the aggregate of all Ownership Interests.

- 5 -

1.25    "Transferring Member." A Member or Economic Interest Owner who sells, assigns, pledges, hypothecates or otherwise transfers for consideration or gratuitously all or any portion of his or her Membership Interest or Economic Interest.

1.26    "Treasury Regulations" or "Regulations." The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.27    "Year of the Company." An annual accounting period ending December 31 of each year or part thereof during the term of this Operating Agreement.

## ARTICLE II
## FORMATION OF COMPANY

2.01    Formation. On or about September 13, 2004, the Company was formed as a Georgia limited liability company by the execution and delivery of the Articles of Organization to the Secretary of State of Georgia in accordance with the provisions of the Act.

2.02    Name. The name of the Company is "Sagdiana, LLC"

2.03    Principal Place of Business. The principal place of business of the Company within the State of Georgia is 3016 Henderson Mill Road, Atlanta, Georgia 30341. The Company may locate its places of business and registered office at any other place or places as the Managers may from time to time deem advisable.

2.04    Registered Office and Registered Agent. The Company's registered office shall be at the office of its registered agent at 1050 Crown Pointe Parkway, Suite 410, Atlanta, Georgia 30338 and the name of its registered agent at such address is Charles I. Pollack. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Act and the applicable rules promulgated thereunder.

2.05    Term. The term of the Company shall commence on the date the Articles of Organization were filed with the Secretary of State of Georgia and shall continue thereafter until dissolved in accordance with the provisions of this Operating Agreement or the Act.

## ARTICLE III
## BUSINESS OF COMPANY

3.01    Permitted Business. The business of the Company shall be:

- 6 -

(i)     To own, develop, use, lease, manage, sell, and otherwise deal with the Property.

(ii)    To accomplish any lawful business whatsoever, or which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets.

(iii)   To exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by limited liability companies under the Act.

(iv)    To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE IV
## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as follows:

| Member | Address |
|---|---|
| Boris Mallayev | 3016 Henderson Mill Road Atlanta, Georgia 30341 |
| Moshe Ishakov | |
| Nelly Ishakov | |
| Ester Tzegaegbe | |
| Shalom S. Cohen | |

## ARTICLE V
## RIGHTS AND DUTIES OF MANAGERS AND OFFICERS

5.01    Management.  The business and affairs of the Company shall be managed by its Managers.  Except for situations in which the approval of the Members is

- 7 -

expressly required by this Operating Agreement or by nonwaivable provisions of applicable law, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.   The unanimous action of all Managers shall be required to take action permitted to be taken hereby by the Managers which has been properly authorized by the Members in accordance with the terms of this Operating Agreement, unless the action of only one Manager is expressly permitted pursuant to this Operating Agreement or the Act or pursuant to the vote of the Managers and/or the Members, as the case may be.

       5.02     Number, Tenure and Qualifications.  The Company shall initially have two (2) Managers.  Except as otherwise provided herein, the number of Managers of the Company shall be fixed from time to time by the affirmative vote of Members owning at least a Supermajority Interest, but in no instance shall there be less than one (1) Manager. Except as otherwise provided herein, each Manager shall hold office until his or her successor shall have been elected and qualified.  Managers shall be elected by the affirmative vote of Members owning at least a Supermajority Interest.  Managers need not be Members. Managers need not be residents of the State of Georgia.

       5.03     Certain Powers of Managers.  Subject to the default conflicting interest provisions of Georgia Act Section 14-11-307, and without limiting the generality of Section 5.01, the Managers shall have the power or authority on behalf of the Company to undertake the following actions upon the affirmative vote of a majority of the Managers present at a meeting at which a quorum (as defined in Section 6.05 hereof) is present:

          (i)   To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

          (ii)   Upon the affirmative vote of the Members holding at least a Majority Interest, to sell, exchange, or otherwise transfer or dispose of all or substantially all, or any portion, of the assets of the Company as part of a single transaction or plan, or otherwise, so long as the disposition is not in violation of, or a cause of default under, any other agreement to which the Company may be bound.  The affirmative vote of the Members shall not be required with respect to any sale or lease of the Property, or any portion thereof, in the ordinary course of the Company's business;

          (iii)   To execute on behalf of the Company all instruments and documents necessary, in the opinion of the Managers, to the business of the Company;

          (iv)   To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

- 8 -

(v)   To institute, prosecute, and defend any legal proceeding in the Company's name;

(vi)   To purchase liability and other insurance to protect the Company's Property and business;

(vii)   To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Members may authorize and direct, subject to any other provisions of this Operating Agreement;

(viii)   To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business; and

(ix)   Upon the affirmative vote of Members owning at least a Majority Interest, to merge the Company with or into any Entity.;

(x)   Notwithstanding anything in this Operating Agreement to the contrary, Manager Shalom S. Cohen shall have no responsibility with respect to the construction of improvements upon the Property or the marketing of residential townhome units to be located upon the Property.

Unless authorized to do so by this Operating Agreement or by a majority of the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

5.04   Liability for Certain Acts.   Each Manager and officer shall act in a manner he or she believes in good faith to be in the best interest of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances. No Manager or officer is liable to the Company, its Members, or other Manager(s) or officer(s) of the Company for any action taken in managing the business or affairs of the Company if he or she performs the duty of his or her office in compliance with the standard contained in this Section. No Manager or officer has guaranteed, or shall have any obligation with respect to the return of, a Member's Capital Contributions or profits from the operation of the Company. No Manager or officer shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member except loss or damage resulting from intentional misconduct or knowing violation of law or a transaction for which such Manager received a personal benefit in violation or breach of the provisions of this Operating Agreement. Each Manager and officer shall be entitled to rely on information, opinions, reports or statements, including but not limited to financial statements or other financial data, prepared or presented in accordance with the provisions of O.C.G.A. Section 14-11-305.

- 9 -

5.05    Managers and Officers Have No Exclusive Duty to Company.   No Manager or officer shall be required to manage the Company as his or her sole and exclusive function.  The Managers may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of any Manager or officer or to the income or proceeds derived therefrom.  No Manager or officer shall incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture.

5.06    Bank Accounts.   The Managers may from time to time open bank accounts in the name of the Company, and the Managers shall be the sole signatories thereon, with only one Managers signature being required, provided the written consent of the other Manager has been obtained, or unless the Members determine otherwise.

5.07    Indemnity of the Managers, Officers, Employees and Other Agents.  To the fullest extent permitted under O.C.G.A. Section 14-11-306, the Company shall indemnify the Managers from and against any and all claims and demands arising in connection with the Company and shall make advances for expenses to them with respect to such matters.  The Company shall indemnify its officers, employees and other agents who are not Managers to the fullest extent permitted by law, provided that such indemnification in any given situation is approved by Members owning at least a Majority Interest.

5.08    Resignation.   Any Manager or officer of the Company may resign at any time by giving written notice to the other Managers of the Company.  The resignation of any Manager or officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The resignation of a Manager or officer who is also a Member shall not affect such person's rights as a Member and shall not constitute a withdrawal of such person as a Member.

5.09    Removal.   At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, only by the affirmative vote of Members holding at least a Supermajority Interest.  The removal of a Manager who is also a Member shall not affect such Manager's rights as a Member and shall not constitute a withdrawal of such Manager as a Member.

5.10    Vacancies.   Any vacancy occurring for any reason (including without limitation, the death or legal incapacity of a Manager) in the number of Managers of the Company shall be filled by the affirmative vote of Members holding at least a Majority Interest.  Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of Members holding at least a Supermajority Interest.  A Manager elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office and shall hold office until the expiration of such term and until his or her successor shall be elected and shall qualify or until his or her earlier death, resignation or removal.  A Manager chosen to fill a position resulting from an increase in the number of

- 10 -

Managers shall hold office until the expiration of the term for which he or she is elected and until his or her successor shall be elected and shall qualify, or until his or her earlier death, resignation or removal.

      5.11    Compensation to Managers. The salaries and other compensation, if any, of the Managers shall be fixed from time to time by an affirmative vote of Members holding at least a Majority Interest and no Manager shall be prevented from receiving any salary or other compensation by reason of the fact that he is also a Member of the Company.

## ARTICLE VI
## MEETINGS OF MANAGERS

      6.01    Special Meetings. Special meetings of the Managers may be called at any time, for any lawful purpose or purposes by any Manager, unless otherwise prescribed by statute.

      6.02    Place of Meetings. The Manager or Managers who call(s) the meeting may designate any place, either within or outside the State of Georgia as the place of such meeting. If no designation is made, the place of the meeting shall be the principal executive office of the Company in the State of Georgia.

      6.03    Notice of Meetings. Written notice (or oral notice if reasonable under the circumstances and permissible under Georgia law) stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered to all of the Managers not less than ten(10) nor more than fifty (50) days before the date of the meeting, either personally or by first class mail, by or at the direction of the Manager or Managers calling the meeting. If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the Manager at his or her address as it appears on the books of the Company, with first class postage thereon prepaid.

      6.04    Meeting of all Managers. If all of the Managers of the Company shall meet at any time and place, either within or outside the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting any lawful action may be taken by the Managers.

      6.05    Quorum. At meetings of the Managers, a majority of the total number of Managers shall constitute a quorum for the transaction of business, or in the event that the number of Managers shall be less than three (3), then the presence of all of the Managers shall be necessary to constitute a quorum. In the absence of a quorum at any meeting of the Managers, a majority of the Managers present may adjourn the meeting. Notice of the time and place of the adjourned meeting and of the business to be transacted thereat, other than by announcement at the meeting at which the adjournment is taken, shall not be necessary. At an adjourned meeting at which a quorum of the Managers is present,

any business may be transacted which could have been transacted at the meeting as originally noticed.

6.06    Manner of Acting. Unless a greater or lesser number is required by this Operating Agreement, the Articles of Organization, or the Act, the unanimous consent (if there are two Mangers) or the affirmative vote of a majority of the Managers (if more than two Managers) present at a meeting at which a quorum is present shall be the act of the Managers.

6.07    Action by Managers Without a Meeting. Any action required or permitted to be taken at a meeting of the Managers may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the required number of the Managers to take such action, and such written consents are delivered to the Company for inclusion in the minutes or for filing with the Company records. The Company shall within two (2) days after receipt provide a copy of such consent action to any Managers who did not sign it. Action taken under this Section is effective when the number of Managers required to approve such consent have signed the consent, unless the consent specifies a different effective date. The record date for determining the Managers entitled to take action without a meeting shall be the date on which the first Manager signs a written consent.

6.08    Waiver of Notice. When any notice is required to be given to any Manager, a waiver thereof in writing signed by the Manager entitled to such notice, whether before, at or after the time stated in the notice, shall be equivalent to the giving of such notice. The aforesaid waiver shall be delivered to the Company and attached to the minutes of the meeting. Attendance of a Manager at a meeting shall constitute a waiver of notice of that meeting unless the Manager attends for the express purpose of objecting to the transaction of business on the grounds that the meeting has not been lawfully called or convened.

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF MEMBERS

7.01    Limitation on Liability. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

7.02    No Liability for Company Obligations. No Member will have any personal liability for any debts or losses of the Company beyond its respective Capital Contributions, except as provided by law.

7.03    List of Members. Upon written request of any Member, the Managers shall provide a list showing the names, addresses, Membership Interests and Economic Interests of all Members and Economic Interest Owners and the other information required by O.C.G.A. Section 14-11-313 and maintained pursuant to Section 12.01 hereof.

- 12 -

7.04     Priority and Return of Capital.  Except as expressly provided in ARTICLES X or XI, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions.  This Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

7.05     Powers Reserved to Members.  Upon the affirmative vote of a majority of the Members present at a meeting at which a quorum (as defined in Section 8.06 hereof) is present the Members shall have the power or authority on behalf of the Company to authorize the following actions:

(i)     To acquire property from any Person as the Members may determine.

(ii)     To borrow money for the Company from banks or other lending institutions on such terms as the Members deem appropriate, and, in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums.

## ARTICLE VIII
## MEETINGS OF MEMBERS

8.01     Special Meetings.  Special meetings of the Members may be called at any time, for any lawful purpose or purposes, by a majority of the Managers or by a Member or Members holding at least twenty (20%) percent of all Membership Interests.

8.02     Place of Meetings.  The Managers or Member(s) who call the meeting may designate any place within the State of Georgia as the place of such meeting. The meeting may be outside the State of Georgia with the consent of Members owning a Supermajority Interest.  If no designation is made, the place of the meeting shall be the principal executive office of the Company in the State of Georgia.

8.03     Notice of Meetings.  Written notice (or oral notice if reasonable under the circumstances and permissible under Georgia law) stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by first class mail, by or at the direction of the Managers or Member(s) calling the meeting, to each Member entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the Member at its address as it appears on the books of the Company, with first class postage thereon prepaid.

8.04     Meeting of all Members. If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of

- 13 -

a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting any lawful action may be taken.

8.05     Record Date. For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting regarding any such matter is mailed or personally delivered or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

8.06     Quorum. Members holding at least a Majority Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Ownership Interests so represented may adjourn the meeting without further notice for a period not to exceed sixty (60) days. However, if at the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Ownership Interests whose absence would cause less than a quorum to be present.

8.07     Manner of Acting. If a quorum is present, the affirmative vote of Members holding at least a Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise expressly provided herein or required under applicable law, Members who have an interest (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Ownership Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

8.08     Proxies. At all meetings of Members a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Managers of the Company before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

8.09     Action by Members Without a Meeting. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if one or more written consents describing in detail the action to be taken are delivered, either personally or by first class mail, to each of the Members entitled to vote with respect to such

- 14 -

action, such written consents are signed by Members or their proxies entitled to vote with respect to such action who hold at least the minimum percentage of Ownership Interests required to approve such action, and such written consents are delivered to the Managers of the Company for inclusion in the minutes or for filing with the Company records. The Managers shall within two (2) days after receipt provide a copy of such consent action to any Members who did not sign it. Action taken under this Section is effective when the necessary number of Members required to approve such action have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the last Member signs a written consent.

8.10     Waiver of Notice. When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated in the notice, shall be equivalent to the giving of such notice. The aforesaid waiver shall be delivered to the Company and attached to the minutes of the meeting. Attendance of a Member at a meeting shall constitute a waiver of notice of that meeting unless the Member attends for the express purpose of objecting to the transaction of business on the grounds that the meeting has not been lawfully called or convened.

## ARTICLE IX
## CAPITAL CONTRIBUTIONS

9.01     Initial Capital Contributions. The Company is being formed pursuant to an election to convert from a general partnership in accordance with O.C.G.A. § 14-11-212, and each partner of the general partnership is deemed to have exchanged such partnership interest for a membership interest of the Company. Upon execution hereof by all Members and the Manager, each Member shall be deemed to have made the Initial Capital Contributions to the Company as set forth in Exhibit "A".

9.02     Additional Contributions. In addition to the Initial Capital Contributions, an affirmative vote of Members holding at least a Supermajority Interest is required to determine from time to time that additional Capital Contributions are needed to enable the Company to conduct its business. Upon such a determination, the Company shall give Notice to all Members in writing at least fifteen (15) days prior to the date on which such Capital Contribution is due. Such Notice shall set forth the amount of additional Capital Contribution needed, the purpose of the Capital Contribution, and the date by which the Members may contribute. Each Member shall be entitled to contribute a proportionate share of such additional Capital Contribution based upon such Member's Ownership Interest, however, no Member shall be obligated to make any such additional Capital Contribution. If any Member refuses to contribute his pro-rata share of such Additional Capital Contributions, the full amount of such Additional Contributions shall be treated as loans to the Company by the Member(s) contributing such Additional Capital Contributions drawing

- 15 -

interest at the Prime Rate, as announced from time to time by Bank of America, N.A. (or its successor), plus six (6%) percent, and receive priority over any other distributions.

        9.03    <u>Withdrawal or Reduction of Members' Contributions to Capital.</u> No Member shall be entitled to withdraw any part of such Member's Capital Contributions or to receive any other distributions from the Company, except as hereinafter provided.

## ARTICLE X
## ALLOCATION OF NET PROFIT AND NET LOSS.

        10.01    <u>Net Profit</u>. After giving effect to the special allocations contained in Sections 10.03, 10.04 and 10.05 below, the Company's Net Profit for each Accounting Period shall be allocated to the Members and Economic Interest Owners in the following manner and in the following order of priority:

        (i)    First, each Member and Economic Interest Owner will be allocated, prorata based on negative Capital Account balances, an amount which is equal to the amount, if any, by which zero exceeds the balance in such Member's or and Economic Interest Owner's Capital Account as of the date of such allocation;

        (ii)    Finally, unless otherwise unanimously agreed upon by the Members, any remaining Net Profit shall be allocated to the Members and Economic Interest Owners in proportion to their respective OwnershipEconomic Interests in the Company.

The allocations of Net Profit pursuant to this Section 10.01 shall be made prior to the further adjustment of the Members' Capital Account balances resulting from distributions of cash pursuant to ARTICLE XI made during or with respect to such Accounting Period.

        10.02    <u>Net Loss</u>. After giving effect to the special allocations contained in Sections 10.03, 10.04 and 10.05 below, the Company's Net Loss for each Accounting Period shall be allocated to the Members and Economic Interest Owners in the following manner and in the following order of priority:

        (i)    First, to the Members and Economic Interest Owners in proportion to and to the extent of their positive Capital Account balances until all Capital Account balances have been reduced to zero; and

        (ii)    Finally, unless otherwise unanimously agreed upon by the Members, the remaining Net Loss shall be allocated to the Members and Economic Interest Owners in proportion to their respective OwnershipEconomic Interests in the Company.

The allocations of Net Loss pursuant to this Section 10.02 with respect to any Accounting Period shall be made prior to the further adjustment of the Members' and Economic Interest

C:\DOCUMENTS AND SETTINGS\SABBAN\STRATFORD\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.IE5\RZ06V5FA73\AGHANA_A_R_OPERATING_AGT_3_(2).DOC

Owners' Capital Account balances resulting from distributions of cash pursuant to ARTICLE XI made during or with respect to such Accounting Period.

        10.03    Special Allocations.    The following special allocations shall be made in the following order:

        (i)    Minimum Gain Chargeback.    If there is a net decrease in "Minimum Gain" [as that term is defined in Treasury Regulations Section 1.704-2(b)(2)] during any Accounting Period, then each Member and Economic Interest Owners shall be allocated items of Company Net Profit for such Accounting Period (and, if necessary, subsequent Accounting Periods) in an amount equal to the greater of (a) the amount necessary to eliminate such Member's or Economic Interest Owner's Adjusted Capital Account Deficit [as defined in Subsection (v) of this Section 10.0210.03] as of the end of such Accounting Period, or (b) the portion of the Member's or Economic Interest Owner's share of the net decrease in Minimum Gain during such Accounting Period that is allocable to a disposition of Company assets subject to a nonrecourse liability. The items so allocated pursuant to this Subsection (i) shall be determined in accordance with Section 1.704-2(f)(6). This Subsection (i) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) and shall be interpreted consistently therewith.

        (ii)    Chargeback for Member Nonrecourse Debt.    If there is a net decrease in any Accounting Period in "Minimum Gain Attributable to Member Nonrecourse Debt" [determined in accordance with Treasury Regulations Section 1.704-2(i)(4)], then each Member and Economic Interest Owner with a share of the Minimum Gain Attributable to Member Nonrecourse Debt at the beginning of the Accounting Period shall be allocated items of Net Profit for such Accounting Period (and, if necessary, for subsequent Accounting Periods) in an amount equal to the greater of (a) the amount necessary to eliminate such Member's or Economic Interest Owner's Adjusted Capital Account Deficit as of the end of such Accounting Period, or (b) the portion of such Member's or Economic Interest Owner's share of the net decrease in Minimum Gain Attributable to Member Nonrecourse Debt that is allocable to the disposition of Company assets subject to such debt. The items so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f)(6). This Subsection (ii) is intended to comply with the chargeback requirements of such Treasury Regulations Section and shall be interpreted consistently therewith.

        (iii)    Qualified Income Offset.    In the event any Member or Economic Interest Owner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4) through (6), items of Company Net Profit shall be specially allocated to such Member or and Economic Interest Owner in an amount and manner sufficient to eliminate its Adjusted Capital Account Deficit as quickly as possible, but only to the extent required by Treasury Regulations Section 1.704-1(b)(2)(ii)(d) for a "qualified income offset".

        (iv)    Member Nonrecourse Deductions.    "Member Nonrecourse Deductions" [as that term is defined in Treasury Regulations Section 1.704-2(c)] for any

- 17 -

Accounting Period shall be allocated to the Member or and Economic Interest Owner who bears the economic risk of loss of such Member Nonrecourse Debt [determined in accordance with Treasury Regulations Section 1.704-2(i)].

(v)   Adjusted Capital Account Deficits.   For purposes of this Operating Agreement, "Adjusted Capital Account Deficit" shall mean the negative balance in a Member's or Economic Interest Owner's Capital Account after debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4)-(6) and crediting to such Capital Account the amount, if any, which such Member or Economic Interest Owner is treated as having the obligation to restore pursuant to Treasury Regulations Section 1.704-1(b).

(vi)   Section 754 Adjustments.   In the event an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

(vii)   Imputed Interest Income.   In the event the Company is required to recognize any interest income by virtue of the application of Code Sections 483 or 1271 through 1288 with respect to a contribution by a Member to the Company, such Member shall be specially allocated items of Company income and gain in an amount equal to such interest income.

(viii)   Member Loans to Company.   In the event any loan made by a Member or Economic Interest Owner to the Company is treated as a "below-market loan" described in Code Section 7872 or results in the recognition of "original issue discount" (within the meaning of Code Section 1273), the Member or Economic Interest Owner making such loan shall be specially allocated items of Company loss or deduction in an amount equal to the Company interest expense which arises by virtue of the application of Code Sections 7872 or 1273 to such loan.

10.04   Curative Allocations.   In the event that pursuant to Section 10.03 of this Operating Agreement, any Member or Economic Interest Owner is allocated items of Company income, gain, deduction or loss in an amount which differs from the amount which would have been allocated to such Member or Economic Interest Owner had such Section not been included in this Operating Agreement ("Disproportionate Allocations"), subsequent allocations of income, gain, deduction or loss shall, to the extent possible, be adjusted such that the net amount of such Disproportionate Allocations and the subsequent allocations shall be zero. Notwithstanding the preceding sentence, Disproportionate Allocations relating to the Member Nonrecourse Deductions shall not be taken into account except to the extent of any reduction in Minimum Gain Attributable to Member Nonrecourse Debt. The parties

- 18 -

hereto intend for the foregoing provision to adjust allocations so that, to the extent possible, each Member or Economic Interest Owner receives the same amount of cash from the Company upon liquidation of the Company pursuant to Section 11.01 as such Member or Economic Interest Owner would have received had such Disproportionate Allocations not been made.

        10.05    704(c) Allocations. In the event that any Company property is credited to the Capital Account of a Member or Economic Interest Owner [as a result of the contribution of such property, a revaluation pursuant to Treasury Regulations Section 1.704-1(b)(iv)(f), or as otherwise required by the Treasury Regulations] at a value which differs from the adjusted tax basis of such property, items of income, gain, loss and/or deduction with respect to such property shall be allocated between the Members and Economic Interest Owners in the manner required by Code Section 704(c) and any Treasury Regulations promulgated thereunder so as to take account of such difference. Such allocations are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account, or share of Net Profit, Net Loss, distributions, or other items set forth in this Operating Agreement.

        10.06    Application of Credit Items. To the extent permitted by law, all credit items are allocated in proportion to each Member's or Economic Interest Owner's Economic Interest.

## ARTICLE XI
## DISTRIBUTIONS

        11.01    Distributions of Cash. Unless otherwise unanimously agreed upon by the Members, or otherwise provided for in this Operating Agreement, the Company's Distributable Cash shall be distributed to the Members and Economic Interest Owners in proportion to their respective Economic Interests, provided that distributions will be made in accordance with Section 15.03 following the dissolution of the Company as provided in Section 15.01.

        11.02    Consent to Distributions. Each of the Members does hereby consent to the distributions provided for herein and does hereby agree to execute from time to time any amendments to this Operating Agreement which are necessary or appropriate to reflect the distributions provided for herein.

        11.03    Limitation Upon Distributions. No distribution shall be made to Members or Economic Interest Owners if prohibited by O.C.G.A. Section 14-11-407.

        11.04    Interest On and Return of Capital Contributions. No Member or Economic Interest Owner shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for herein. Regardless of the nature of a Member's Capital Contribution to the Company, such Member or

- 19 -

Economic Interest Owner has only the right to demand and receive cash from the Company at such times as the Company elects to make distributions to the Members.

11.05    Loans to Company.    Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

11.06    Special Rules.    Notwithstanding anything in the Operating Agreement to the contrary, Shalom S. Cohen shall be entitled to receive the first One Million, Five Hundred Thousand and No/100 Dollars ($1,500,000.00) of Distributable Cash derived from the sale of residential townhome units upon the Property. All other or subsequent distributions of Distributable Cash shall be made in accordance with the provisions of Section 11.01 above.

## ARTICLE XII
## BOOKS AND RECORDS

12.01    Records, Audits and Reports.    At the expense of the Company, the Managers shall maintain records and accounts of all operations and expenditures of the Company. The Company shall keep at its principal place of business the following records:

(i)    A current list of the full name and last known address of each Member, Economic Interest Owner and Manager, and an accounting of the Capital Account of each Member and Economic Interest Owner;

(ii)    Copies of records to enable a Member to determine the relative voting rights, if any, of the Members;

(iii)    A copy of the Articles of Organization of the Company and all amendments thereto;

(iv)    Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(v)    Copies of the Company's written Operating Agreement, together with any amendments thereto;

(vi)    Copies of any financial statements of the Company for the three most recent years;

(vii)    Minutes of every annual, special and court-ordered meeting of Members or Managers; and

(viii)    Any written consents obtained for actions taken by Members or Managers without a meeting.

- 20 -

12.02    Tax Returns. The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.

12.03    Reports to Members. The Managers will provide reports at least annually to the Members at such time and in such manner as the Managers may determine reasonable.

## ARTICLE XIII
## TRANSFERABILITY

13.01    General. Except as otherwise specifically provided herein, neither a Member nor an Economic Interest Owner shall have the right to:

(i)    sell, assign, pledge, hypothecate, exchange or otherwise transfer for consideration (collectively, "sell"), or

(ii)    gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy) (collectively, "gift");

all or any part of its Membership Interest or Economic Interest without the consent of the Managers. Each Member hereby acknowledges the reasonableness of the restrictions on sale and gift of Membership Interests and Economic Interests imposed by this Operating Agreement in view of the Company purposes and the relationship of the Members and Economic Interest Owners. Accordingly, the restrictions on sale and gift contained herein shall be specifically enforceable.

Notwithstanding anything set forth in this Agreement to the contrary, any Member may at any time, and from time to time, sell or gift (collectively, "Transfer") all, or any portion of, or any interest or rights in, such Member's Economic Interest or Membership Interest to (i) any other Member; (ii) any member of the Member's Family, or (iii) a single member entity formed for the benefit of and exclusively owned and controlled by such Member (for example, a single-member limited liability company). As used herein, "Family" means a Member's spouse, lineal ancestors or descendants by birth or adoption, siblings, and trusts or Entities for the exclusive benefit of a Member or any of the foregoing individuals. Upon any transferTransfer pursuant to this Paragraph, both the transferor and transferee shall execute such documentation required by the Company to confirm the agreement of such transferee to the terms and conditions of this Operating Agreement and to otherwise acknowledge such transferTransfer.

13.02    Right of First Refusal.

- 21 -

(i)   Notwithstanding anything in Section 13.01 to the contrary, a Member or an Economic Interest Owner ("Selling Member") who does not receive the consent of the Managers to Transfer its Membership Interest or Economic Interest may Transfer all or any part of its Membership Interest or Economic Interest in accordance with the provisions of this Section. Selling Member shall first give to the other Members (each a "Notified Member") written notice (the "Offer Notice") of all the terms of a *bona fide* third party offer it has received (and is willing to accept) to sell all or any part of its Membership Interest or Economic Interest (the "Subject Interest"). The Notified Members collectively shall have the right to buy all (but not less than all) of the Subject Interest for a purchase price and on terms at least equal to the purchase price and terms offered by the third party (the "Refusal Price") exercisable by giving written notice to all Members and the Company within thirty (30) days after receipt of the Offer Notice ("Refusal Period"). Each Notified Member's notice shall specify how much of the total Subject Interest the accepting Notified Member elects to purchase and the price and terms of purchase, and whether the Notified Member desires to purchase more of the Subject Interest than they have a priority right to, as explained below. If the total amount that all accepting Notified Members desire to purchase exceeds the Subject Interest, each accepting Notified Member shall have priority, up to the amount set forth in the accepting Notified Member's notice, to purchase that fraction of the Subject Interest in which the numerator is the Ownership Interest owned by the accepting Notified Member and the denominator is the Ownership Interests owned by all accepting Notified Members. The portion of the Subject Interest not purchased on such a priority basis shall be allocated to those accepting Notified Members who have indicated in their written notices that they desire to purchase more than the amount to which they have a priority right, with the allocation determined by that fraction the numerator of which is the Ownership Interest owned by each such accepting Notified Member and the denominator of which is the total Ownership Interest owned by all accepting Notified Members. The Notified Members may purchase all of the Subject Interest but may not together purchase less than all of the Subject Interest. The Refusal Price shall be paid on the same terms, time, manner and conditions as are set forth in the Offer Notice or, at the Notified Member's option, in cash. If the Notified Members shall exercise the right of first refusal, the closing of the purchase and sale of the Subject Interest shall occur within forty-five (45) days after the Refusal Period at a time and place to be specified by the purchasing Notified Member purchasing the largest amount of the Subject Interest. If the Notified Members shall not exercise the right of first refusal and thereafter close the purchase and sale of the Subject Interest as provided above, the Selling Member shall be free to sell all of the Subject Interest, provided that said sale is consummated on the terms set forth in the Offer Notice within sixty (60) days after the date of the Refusal Period. If the sale of the Subject Interest is not consummated within said sixty (60) day period, then the Subject Interest shall again be subject to the restrictions of this Operating Agreement. Each transferee of all or any portion of the Subject Interest shall, as a condition to the transfer of the Subject Interest, agree to be bound by this Operating Agreement to the same extent and in the same manner as the Selling Member is bound.

13.03     Transferee Not Member in Absence of Authorization.

(i)     Notwithstanding anything contained herein to the contrary, if the Managers do not approve the proposed Transfer of the Transferring Member's Membership Interest or Economic Interest to a transferee or donee which is not a Member immediately prior to the Transfer, then the proposed transferee or donee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee or donee shall be merely an Economic Interest Owner. No Transfer of a Member's interest in the Company (including any Transfer of the Economic Interest or any other Transfer which has not been approved by unanimous vote or written consent of the Members) shall be effective unless and until written notice (including the name and address of the proposed transferee or donee and the date of such transfer) has been provided to the Company and the nontransferring Members.

(ii)     Upon and contemporaneously with any Transfer of a Transferring Member's Economic Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interest transferred by the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), the Company shall purchase from the Transferring Member, and the Transferring Member shall sell to the Company for a purchase price of One Hundred and No/100 ($100.00) Dollars, all remaining rights and interest retained by the Transferring Member which immediately prior to such sale or gift were associated with the transferred Economic Interest.

## ARTICLE XIV
## ADDITIONAL MEMBERS

From the date of the formation of the Company, any Person acceptable to the Managers may become a Member of the Company either by the issuance by the Company of Membership Interests for such consideration as the Members by their unanimous votes or written consent shall determine, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Managers may, at their option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## ARTICLE XV
## DISSOLUTION AND TERMINATION

15.01     Dissolution.

- 23 -

(i)     The Company shall be dissolved only upon the occurrence of any of the following events:

(a)     the written agreement of Members holding at least a Supermajority Interest;

(b)     any other event requiring the dissolution of the Company under the laws of the State of Georgia.

(ii)    If a Member who is an individual dies or a court of competent jurisdiction adjudges him or her to be incompetent to manage his or her person or his or her property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his or her estate or administering his or her property.

(iii)   Except as expressly permitted in this Operating Agreement, a Member shall not voluntarily withdraw or take any other voluntary action which terminates the continued membership of such Member in the Company (a "Withdrawal Event"). Unless otherwise approved by Members owning at least a Majority Interest, a Member who withdraws (a "Withdrawing Member") or whose Membership Interest is otherwise terminated by virtue of a Withdrawal Event, regardless of whether such Withdrawal Event was the result of a voluntary act by such Member, shall not be entitled to receive any distributions to which such Member would have otherwise been entitled had such member remained a Member.   Except as otherwise expressly provided herein, a Withdrawing Member shall become an Economic Interest Owner.  Damages for breach of this Subsection (iii) shall be monetary damages only (and not specific performance), and such damages may be offset against distributions by the Company to which the Withdrawing Member would otherwise be entitled.

15.02    Effect of Dissolution.  Upon dissolution, the Company shall cease to carry on its business, except as permitted by O.C.G.A. Sections 14-11-604 and 14-11-605. Upon dissolution, the Managers shall file a statement of commencement of winding up pursuant to O.C.G.A. Section 14-11-606 and publish the notice permitted by O.C.G.A. Section 14-11-608.

15.03    Winding Up, Liquidation and Distribution of Assets.

(i)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.   The Managers shall immediately proceed to wind up the affairs of the Company.

(ii)    If the Company is dissolved and its affairs are to be wound up, the Managers shall:

- 24 -

(a)   Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members in kind),

(b)   Allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' in accordance with ARTICLE X hereof,

(c)   Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company,

(d)   Distribute the remaining assets in proportion to each Member's Ownership Interest. If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by the Managers. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale. The distribution of cash and/or property to a Member in accordance with the provisions of this Section constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Membership Interests and all the Company's property.

(iii)   Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(iv)   Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(v)   The Managers shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

15.04   Certificate of Termination.   When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a

- 25 -

Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A. Section 14-11-610.

      15.05      <u>Return of Contribution Nonrecourse to Other Members</u>. Except as provided by law or as otherwise expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

      16.01      <u>Books of Account and Records</u>. Proper and complete records and books of account shall be kept or shall be caused to be kept by the Managers in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. The books and records shall be maintained at all times at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members and Economic Interest Owners or their duly authorized representatives during reasonable business hours.

      16.02      <u>Application of Georgia Law</u>. This Operating Agreement, and the application and interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Act, without regard to that state's conflicts of law provisions.

      16.03      <u>No Action for Partition</u>. No Member or Economic Interest Owner has any right to maintain any action for partition with respect to the property of the Company.

      16.04      <u>Execution of Additional Instruments</u>. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

      16.05      <u>Construction</u>. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

      16.06      <u>Headings</u>. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

C:\DOCUMENTS AND SETTINGS\ADR\DESKTOP\HEMLOCAL 3111.NCS\TEMPORARY INTERNET FILES\CONTENT.IE5\KDMN0Y47SA\CHANA_A_B_OPERATING_AGT_8_(2).DOC

16.07     Waivers. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

16.08     Rights and Remedies Cumulative.   The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise

16.09     Severability.  If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

16.10     Heirs, Successors and Assigns.   Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

16.11     Creditors. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

16.12     Counterparts.   This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

16.13     Federal Income Tax Elections.  All elections required or permitted to be made by the Company under the Code shall be made by the Managers, in their sole discretion, pursuant to a vote of a majority of the Managers.  For all purposes permitted or required by the Code, the Members constitute and appoint Boris Mallayev as Tax Matters Manager or, if Boris Mallayev is no longer a Manager, another Tax Matters Manager shall be designated by the Members by vote of those Members holding at least a Majority Interest.

16.14     Certification of Non-Foreign Status.   In order to comply with Section 1445 of the Code and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each Member shall provide to the Company, an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as the term is defined in the Code and Treasury Regulations.  Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Managers to withhold ten (10%) percent of each such Member's distributive share of the amount realized by the Company on the disposition.

- 27 -

16.15   Notices.   All notices, elections, requests, demands or other communications hereunder shall be in writing, signed by or on behalf of the party giving the same, and shall be deemed to have been properly given and shall be effective upon being (i) personally delivered, (ii) deposited with a recognized overnight courier service such as FedEx, Airborne Express, UPS overnight or the like, or (iii) deposited in the United States mail, postage prepaid, certified with return receipt requested, to the other party at the address of such other party set forth in ARTICLE IV or at such other address within the continental United States as such other party may designate by notice specifically designated as a notice of change of address and given in accordance herewith; provided, however, the time period in which a response to any such notice, election, demand or request must be given shall commence on the date of receipt thereof; and provided further that no notice of change of address shall be effective until the date of receipt thereof.  Personal delivery to a party or to any officer, partner, agent or employee of such party at said address shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of change in address of which no notice has been received shall also constitute receipt.

16.16   Amendments.   Any amendment to this Operating Agreement and/or the Articles of Organization shall be made in writing and signed by all Persons who are Members of the Company on the effective date of the amendment.

16.17   Invalidity.   The invalidity or unenforceability of any particular provision of this Operating Agreement shall not affect the other provisions hereof, and the Operating Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.  If any particular provision herein is construed to be in conflict with the provisions of the Act, the Act shall control and such invalid or unenforceable provision shall not affect or invalidate the other provisions hereof, and this Operating Agreement shall be construed in all respects as if such conflicting provision were omitted.

16.18   Banking.   All funds of the Company shall be deposited in its name in an account or accounts as shall be designated from time to time by the Managers.  All funds of the Company shall be used solely for the business of the Company.  All withdrawals from the Company bank accounts shall be made only upon check signed by one or more of the Managers or by such other persons as the Managers may designate from time to time.

16.19   Arbitration.   Except as otherwise specifically provided herein, any dispute, controversy or claim arising out of or in connection with, or relating to, this Operating Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the City of Atlanta, State of Georgia, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any time or at any other place or under any other form of arbitration mutually acceptable to the parties so involved).  Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction.  The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear

- 28 -

the cost of its own experts, evidence and counsel's fees, except that in the discretion of the arbitrator, any award may include the cost of a party's counsel if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic.

16.20    Determination of Matters Not Provided For In This Operating Agreement. Members owning a Supermajority Interest shall decide any questions arising with respect to the Company and this Operating Agreement which are not specifically or expressly provided for in this Operating Agreement.

16.21    Further Assurances. The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Operating Agreement.

16.22    Time. TIME IS OF THE ESSENCE OF THIS OPERATING AGREEMENT, AND TO ANY PAYMENTS, ALLOCATIONS AND DISTRIBUTIONS SPECIFIED UNDER THIS OPERATING AGREEMENT.

16.23    Investment Purpose. Each Member hereby represents and warrants that its Membership Interest in the Company is being acquired solely for investment purposes and not with a view to, or for, sale, assignment, transfer or distribution and that it is acquiring such Membership Interest only for its own account and that it realizes and understands that an acquisition of a Membership Interest with an intent to resell because of any foreseeable specific contingency, or some predetermined event, would represent an acquisition with an intent inconsistent with the foregoing and might cause such a disposition to be considered a sale for which an exemption under applicable federal and state securities laws is not available.

16.24    Termination of Prior Agreements. This Agreement supersedes any and all other agreements, either oral or in writing, among the parties hereto with respect to the subject matter hereof, and contains all of the covenants and agreements among the parties with respect to such subject matter.

[Continued on Next Page]

16.25 Acknowledgments. EACH MEMBER ACKNOWLEDGES THAT THE COMPANY'S COUNSEL, SEGAL, FRYER, SHUSTER & LESTER, P.C., PREPARED THIS AGREEMENT ON BEHALF OF AND IN THE COURSE OF ITS REPRESENTATION OF MIKHAIL MALLAYEV THAT EACH MEMBER HAS BEEN ADVISED BY THE COMPANY'S COUNSEL TO SEEK THE ADVICE OF INDEPENDENT COUNSEL. EACH MEMBER FURTHER ACKNOWLEDGES THAT SUCH MEMBER HAS CAREFULLY READ AND REVIEWED THE ENTIRE AGREEMENT BEFORE EXECUTING THE SAME AND HAS HAD AN OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL. EACH MEMBER ALSO ACKNOWLEDGES THAT SUCH MEMBER HAS BEEN ADVISED BY THE COMPANY'S COUNSEL THAT THIS AGREEMENT HAS TAX CONSEQUENCES AND EACH MEMBER HAS BEEN ADVISED BY THE COMPANY'S COUNSEL TO SEEK THE ADVICE OF AN INDEPENDENT TAX ADVISOR.

IN WITNESS WHEREOF, the parties hereto have executed this Operating Agreement this _____ day of _____ , _____ .

"COMPANY":                           "MEMBERS":
SAGDIANA, LLC

By: _Boris Mallayev_                 _Boris Mallayev_
    Boris Mallayev, Manager          Boris Mallayev

By: _____                  _Moshe Ishakov_
    Shalom S. Cohen, Manager         Moshe Ishakov

                                     _Nelly Ishakov_
                                     Nelly Ishakov

                                     _____
                                     Ester Tzegaegbe

                                     _____
                                     Shalom S. Cohen

- 30 -

## EXHIBIT "A"

### INITIAL CAPITAL CONTRIBUTIONS

Member                              Initial Capital Contribution

Boris Mallayev

Moshe Ishakov

Nelly Ishakov

Ester Tzegaegbe

Shalom S. Cohen          $4,000,000.00, of which $1,500,000.00 has been paid in
                         cash, and the remaining $2,500,000.00 shall be paid
                         from future distributions made by the Company

SHALOM S. COHEN AND OTHERS SIGNAL AGENCIES, INC. OPTIONS TEMPORARILY INTERSECT MIKE CONTENT EMAIL DIRECTING MEMBERS OPERATING AGREEMENT DOC

Exhibit C

Case 1:06-cv-04830-ARR-SMG   Document 1   Filed 09/06/06   Page 58 of 76 PageID #: 58

Chuck Pollack"
<cpollack@sfsllaw.com>   📇 Add
to Address Book  📇 Add Mobile
Alert

To:                          "'benzion frankel'" <benzfr11210@yahoo.com>

Subject:                     RE: Sagdiana

Date:                        Thu, 12 Jan 2006 11:45:13 -0500

you may substitute signature pages, provided the page breaks are the same.

the money needs to be wired into to the account previously designated.

Charles I. Pollack, Esq.
Segal, Fryer, Shuster & Lester, P.C.
Suite 410
1050 Crown Pointe Parkway
Atlanta, Georgia 30338
(770) 668-9300 (telephone)
(770) 668-9465 (facsimile)
http://www.sfsllaw.com

# STERN, ADLER & WEINSTEIN, LLP

ATTORNEYS AT LAW
1025 Old Country Road, Suite 305
Westbury, New York 11590

Tel: (516) 876-1106
Fax: (516) 997-7876
Web Site: www.sawlaw.com
E-Mail: mario@sawlaw.com

Janet S. Stern*
Steven M. Adler
Steven M. Weinstein

\* Admitted in N.Y. & N.J.

\*\* Admitted in N.Y. & Mass.

Mario J. DeRossi\*\*

August 24, 2006

**VIA FACSIMILE**
Segal, Fryer, Shuster & Lester, P.C.
1050 Crown Pointe Parkway
Atlanta, Georgia 30338
Attn: Charles I. Pollack, Esq.

Re:     Sagdiana, LLC and
         Shalom S. Cohen

Dear Mr. Pollack:

Please allow this letter to confirm our telephone conversation yesterday wherein I advised you that this office has been retained by Mr. Cohen as local counsel to investigate and prosecute, as his interests may be, an action to regain controlling interest in Sagdiana, LLC and/or recover Mr. Cohen's million and half dollar investment in said entity. As of this writing, your law firm is continuing to represent Sagdiana, LLC *and all of its members*, although I have serious concerns regarding conflict issues as it relates to your law firm's representation of Sagdiana's four members other than Mr. Cohen to the detriment of Mr. Cohen as hereinafter discussed.

Initially, I enclose for your review, the executed Member Interest Purchase Agreement and Amended and Restated Operating Agreement of Sagdiana. These documents are forwarded to you with the signatures attached evidencing full execution of these agreements. I am also attaching your e-mail, dateline Thursday January 12, 2006 11:53 a.m. wherein you advised Mr. Cohen's prior counsel, Benzion Frankel, Esq.. that he was authorized to substitute the signature pages attached herein, and in essence, to then treat the documents *your law firm* prepared as fully executed. Moreover, you demanded the wire transfer of the balance of the $1.5 million dollars ($1,200,000.00) on that date. I must tell you, I am shocked and dismayed to learn that either you and/or Sagdiana's other four members are now taking the position that these documents were

Page Two
Charles I. Pollack, Esq.
August 24, 2006

never executed. If that is truly your position, kindly advise me immediately under what authority your law firm requested Mr. Cohen to wire his money knowing he was relying on your direction to substitute the signature pages. Be assured, that if that in fact is your position, Mr. Cohen will hold your firm responsible for this money as well. Moreover, it appears quite clear from reading these documents, (specifically, paragraph 5.06 Bank Accounts), that Shalom Cohen's signature or written consent is required before any expenditure is made of Sagdiana. This is not being done. The fact that the money is being misappropriated for personal use is an issue for another day.

Most pressing is the issue of the use of the $1.5 million dollars and the purchase of 100 acres of additional land which Mr. Cohen and his prior counsel believe that Mr. Cohen is a fifty percent owner of. In my conversation with you, you indicated that Mr. Cohen had no interest in this property despite Mr. Cohen and his former attorney being told and shown that a subsidiary of Sagdiana was the contract vendee of that property. You further indicated that the 100 acres or a portion thereof, was purchased in a name other than that of Sagdiana or its subsidiaries. *I have requested that name which you refused to provide.*

I am respectfully advising you and your law firm that the secreting of this information from Mr. Cohen and his attorneys is a direct conflict of interest as your firm is retained to represent all of the members of Sagdiana, Mr. Cohen's 50% interest inclusive. I am hereby demanding that you provide me with that name and that entity and that you cease taking actions that benefit the four members of Sagdiana to the detriment of Mr. Cohen. Moreover, I am advising your law firm that you do not have Mr. Cohen's consent to represent Sagdiana or any subsidiary in any further transaction including but not limited to; purchasing, borrowing, selling or any manner that requires an expenditure of Sagdiana or its related entities.

As I indicated to you previously, barring hearing from you and receiving a satisfactory explanation of the events that have transpired, my client will be left no choice but to seek redress in Federal Court. Unfortunately, that may include causes of action against your law firm.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Steven M. Weinstein

encl.

LAW OFFICES

## SEGAL, FRYER, SHUSTER & LESTER, P.C.

1050 CROWN POINTE PARKWAY
SUITE 410
ATLANTA, GEORGIA 30338
WWW.SFSLLAW.COM

JEFFREY D. SEGAL
KEITH E. FRYER
MICHAEL H. SHUSTER
WILLIAM R. LESTER
CHARLES F. POLLACK
JEFFREY A. POWELL
HELEN DILLON FREED

TELEPHONE
(770) 608-3309

FAX
(770) 668 9465

E-MAIL
CPOLLACK@SFSLLAW.COM

August 24, 2006

## VIA FACSIMILE TO 516-997-7876

Steven M. Weinstein, Esq.
Stern, Adler & Weinstein, LLP
Suite 305
1025 Old Country Road
Westbury, New York  11590

      Re:    Sagdiana, LLC (the "Company") and Shalom S. Cohen

Dear Mr. Weinstein:

      We are in receipt of your facsimile transmission of earlier today.  Consistent with our telephone discussion yesterday, until receipt of your transmission, we had been unaware that the final documents had been signed and we had never been provided with the fully-executed versions of any such documentation.  As mentioned yesterday, we believe early drafts may have been signed, but that the final terms of the buy-in had not been agreed to by all necessary parties.  It is our recollection that certain parties were going out of the country in early/mid-January and that there was some time pressure to have the funds transferred prior to anyone going out of town.

      Note that we shall need to confirm the authenticity of the document execution, and in particular, confirm that correct, final versions were signed.  This letter is subject to such confirmation.  Mr. Mallayev is presently out of town, although we were able to reach him by telephone.  It is our understanding that he will be contacting Mr. Cohen to discuss the present matter.

      Per your request, we will not take any further action on behalf of Sagdiana at this time.  However, please be aware that the existing $4.65 million loan secured by the Sugar Hill Overlook townhome project will mature next week.  Mr. Mallayev has been working on refinancing this debt.  In light of your letter and providing us with signed documents purporting to evidence Mr. Cohen's interest in the Company, you should be aware that a default under the existing loan could trigger a series of events resulting in either a judgment against the borrower or foreclosure of the Sugar Hill Overlook project, or both.  Any of such

Steven M. Weinstein, Esq.
Stern, Adler & Weinstein, LLP
August 24, 2006
Page 2

events would be disastrous to the Company. So that the refinancing efforts may continue, we
have enclosed minutes giving consent to closing on such refinancing. We would ask that Mr.
Cohen sign same (as manager and as member), and return the same to us via facsimile.
Should Mr. Cohen need to sign any other documents in connection with such transaction,
including any personal guaranty of the new obligation, we would anticipate his cooperation
in doing so promptly.

As for the other issues mentioned in your letter, we shall address same in due course.
However, as to your threat of court action, please take note that the Operating Agreement
provides for mandatory arbitration of all disputes (Section 16.19), with same to occur in the
Atlanta, Georgia locale. Should you plan to enforce the Operating Agreement, we presume
you will comply with this provision.

Very truly yours,

SEGAL, FRYER, SHUSTER & LESTER, P.C.

Charles I. Pollack

# Bank of America

BANK OF AMERICA, N.A. (THE "BANK")

**Transaction History**

## SAGDIANA LLC

**BUSINESS ECONOMY CHKG**

003266813086

Last Posting Date     3/02/2006

### Since Last Statement Summary

Last Statement Date     2/28/2006

| | | | |
|---|---|---|---|
| Balance Last Statement | | $ | 318,043.03 |
| Deposits/Credits | # 0 | + | 0.00 |
| Withdrawals/Debits | # 1 | - | 5,000.00 |
| Current Balance | | $ | 313,043.03 |

| Date | Amount | Balance | Transaction |
|---|---|---|---|
| * 12/30/2005 | 3.00 | 292904.52 | Check Enclosure Fee |
| * 1/03/2006 | 40040.00 | 252864.52 | WIRE TYPE:WIRE OUT |
| * 1/03/2006 | 3200.00 | 249664.52 | GA TLR cash withdrawal |
| * 1/03/2006 | 46.52 | 249618.00 | KROGER 3559 CH 01/02 |
| * 1/03/2006 | 31.73 | 249586.27 | Wal-Mart Store 01/03 |
| * 1/04/2006 | 40.00 | 249626.27 | REIMBURSEMENT OF 3RD |
| * 1/04/2006 | 5000.00 | 244626.27 | FUNDS TRANSFER DEBIT FDES |
| * 1/04/2006 | 3000.00 | 241626.27 | DISCOVER ;DES=PHONE PAY |
| * 1/04/2006 | 38.88 | 241587.39 | Wal-Mart Store 01/03 |
| * 1/05/2006 | 30000.00 | 211587.39 | Check 1096 |
| * 1/05/2006 | 3500.00 | 208087.39 | Check 1080 |
| * 1/05/2006 | 1000.00 | 207087.39 | Check 1095 |
| * 1/05/2006 | 91.00 | 206996.39 | CHECKCARD 0103 GEORGIA |
| * 1/05/2006 | 90.54 | 206905.85 | CHECKCARD 0103 SPRINT |
| * 1/05/2006 | 23.10 | 206882.75 | CHECKCARD 0104 NCOURT.COM |
| * 1/06/2006 | 23.83 | 206858.92 | KROGER 3559 CH 01/06 |
| * 1/06/2006 | 21.26 | 206837.66 | Wal-Mart Store 01/06 |
| * 1/06/2006 | 19.90 | 206817.76 | SAM'S Club 01/06 |
| * 1/09/2006 | 1046.44 | 205771.32 | Check 1097 |
| * 1/09/2006 | 100.00 | 205671.32 | BKOFAMERICA ATM 01/08 |
| * 1/09/2006 | 26.88 | 205644.44 | CHECKCARD 0106 BUFORD HWY |
| * 2/10/2006 | 1400.00 | 204244.44 | Check 1103 |
| * 1/10/2006 | 822.70 | 203421.74 | CNS BRANDSMART 01/09 |
| * 1/10/2006 | 33.57 | 203388.17 | CHECKCARD 0109 FEDEX SHP |
| * 1/11/2006 | 25000.00 | 178388.17 | WIRE TYPE:WIRE OUT |
| * 1/11/2006 | 5000.00 | 173388.17 | FUNDS TRANSFER DEBIT FDES |
| * 1/11/2006 | 18000.00 | 155388.17 | GA TLR cash withdrawal |
| * 1/11/2006 | 571.31 | 154816.86 | CHECKCARD 0109 WOLF |
| * 1/11/2006 | 140.00 | 154676.86 | BKOFAMERICA ATM 01/11 |
| * 1/11/2006 | 100.00 | 154576.86 | BKOFAMERICA ATM 01/11 |
| * 1/11/2006 | 25.01 | 154551.85 | QT 709 01/11 #000466755 |
| * 1/12/2006 | 20.00 | 154531.85 | Wire Transfer Fee |
| * 1/12/2006 | 10000.00 | 144531.85 | Check 1108 |
| * 1/12/2006 | 2781.88 | 141749.97 | Check 1099 |
| * 1/12/2006 | 77.25 | 141672.72 | SOU BEST BUY # 01/11 |
| * 1/13/2006 | 31.42 | 141641.30 | SAM'S Club 01/11 |
| * 1/13/2006 | 1200000.00 | 1341641.30 | WIRE TYPE:WIRE IN DATE: |
| * 1/13/2006 | 10.00 | 1341631.30 | Wire Transfer Fee |
| * 1/17/2006 | 900.00 | 1340731.30 | Check 1106 |
| * 1/17/2006 | 960.00 | 1339771.30 | Check 1100 |
| * 1/17/2006 | 35.00 | 1339736.30 | CHECKCARD 0114 TWX*AOL |

---

**P** = Items marked **Pending** have not yet been paid because they could cause your account to be overdrawn. If the Bank pays or returns this item, a service charge may result.

**\*** = Item(s) included in Previous Statement(s).

**For additional information or service, please contact the Customer Service Center at** 800-432-1000

NCA
05-14-0036M (3/2000)

| Date | Amount | Balance | Description |
|---|---|---|---|
| * 1/17/2006 | 33.57 | 1339702.73 | CHECKCARD 0115 FEDEX SHP |
| * 1/17/2006 | 23.90 | 1339678.83 | CHECKCARD 0114 TWX*AOL |
| * 1/23/2006 | 43200.00 | 1296478.83 | Check 1101 |
| * 1/23/2006 | 20000.00 | 1276478.83 | Check 1098 |
| * 1/25/2006 | 200000.00 | 1076478.83 | Check 1105 |
| * 1/27/2006 | 10000.00 | 1066478.83 | FUNDS TRANSFER DEBIT FDES |
| * 1/30/2006 | 129427.08 | 937051.75 | WIRE TYPE:WIRE OUT |
| * 1/30/2006 | 31000.00 | 906051.75 | WIRE TYPE:WIRE OUT |
| * 1/30/2006 | 10000.00 | 896051.75 | Check 1107 |
| * 1/30/2006 | 4751.38 | 891300.37 | CHECKCARD 0127 GWINNETT |
| * 1/30/2006 | 3000.00 | 888300.37 | Check 1109 |
| * 1/30/2006 | 77.25 | 888223.12 | CHECKCARD 0126 PARADIES |
| * 1/30/2006 | 50.00 | 888173.12 | CIRCLE K #8452 01/30 |
| * 1/30/2006 | 20.00 | 888153.12 | Wire Transfer Fee |
| * 1/30/2006 | 20.00 | 888133.12 | Wire Transfer Fee |
| * 1/31/2006 | 2000.00 | 886133.12 | FUNDS TRANSFER DEBIT FDES |
| * 1/31/2006 | 11551.45 | 874581.67 | GA TLR cash withdrawal |
| * 1/31/2006 | 51.00 | 874530.67 | CHECKCARD 0129 SHELL OIL |
| * 1/31/2006 | 3.00 | 874527.67 | Check Enclosure Fee |
| * 2/01/2006 | 1150.00 | 873377.67 | Check 1102 |
| * 2/01/2006 | 10000.00 | 863377.67 | Check 1110 |
| * 2/01/2006 | 1850.00 | 861527.67 | Check 1111 |
| * 2/02/2006 | 614.20 | 860913.47 | CHECKCARD 0130 AIRTRANAIR |
| * 2/02/2006 | 50000.00 | 810913.47 | Check 1112 |
| * 2/02/2006 | 177.10 | 810736.37 | CHECKCARD 0131 AIRTRANAIR |
| * 2/02/2006 | 60.35 | 810676.02 | CHECKCARD 0131 SHELL OIL |
| * 2/02/2006 | 6.35 | 810669.67 | KROGER 3559 CH 02/02 |
| * 2/03/2006 | 100000.00 | 710669.67 | FUNDS TRANSFER DEBIT FDES |
| * 2/03/2006 | 600.00 | 710069.67 | Check 1113 |
| * 2/03/2006 | 100.00 | 709969.67 | BKOFAMERICA ATM 02/02 |
| * 2/06/2006 | 9500.00 | 700469.67 | WIRE TYPE:WIRE OUT |
| * 2/06/2006 | 9500.00 | 690969.67 | WIRE TYPE:WIRE OUT |
| * 2/06/2006 | 9500.00 | 681469.67 | WIRE TYPE:WIRE OUT |
| * 2/06/2006 | 10000.00 | 671469.67 | Check 1104 |
| * 2/06/2006 | 120.00 | 671349.67 | BKOFAMERICA ATM 02/04 |
| * 2/06/2006 | 62.36 | 671287.31 | CHECKCARD 0202 SHELL OIL |
| * 2/06/2006 | 20.00 | 671267.31 | Wire Transfer Fee |
| * 2/06/2006 | 20.00 | 671247.31 | Wire Transfer Fee |
| * 2/06/2006 | 20.00 | 671227.31 | Wire Transfer Fee |
| * 2/07/2006 | 140.00 | 671087.31 | BKOFAMERICA ATM 02/06 |
| * 2/08/2006 | 90000.00 | 581087.31 | Check 1115 |
| * 2/08/2006 | 151.73 | 580935.58 | MACYS EAST 00 02/08 |
| * 2/08/2006 | 101.75 | 580833.83 | Star NE 02/08 #000003406 |
| * 2/08/2006 | 55.71 | 580778.12 | CHECKCARD 0207 KROGER |
| * 2/08/2006 | 2.00 | 580776.12 | Star NE 02/08 #000003405 |
| * 2/08/2006 | 2.00 | 580774.12 | Star NE 02/08 #000003406 |

# Bank of America

BANK OF AMERICA, N.A. ("THE "BANK")

## Transaction History

| Date | Amount | Balance | Transaction |
|------|--------|---------|-------------|
| * 2/09/2006 | 100000.00 | 480774.12 | Check 1114 |
| * 2/10/2006 | 501.75 | 480272.37 | NEW YORK COMMU 02/10 |
| * 2/10/2006 | 140.00 | 480132.37 | BKOFAMERICA ATM 02/10 |
| * 2/10/2006 | 2.00 | 480130.37 | NEW YORK COMMU 02/10 |
| * 2/10/2006 | 1.50 | 480128.87 | NEW YORK CO 02/10 |
| * 2/13/2006 | 2.00 | 480126.87 | Star NE 02/12 #000004190 |
| * 2/13/2006 | 161.75 | 479965.12 | Star NE 02/12 #000004191 |
| * 2/13/2006 | 2.00 | 479963.12 | Star NE 02/12 #000004191 |
| * 2/14/2006 | 141.75 | 479821.37 | NORTH FORK BAN 02/14 |
| * 2/14/2006 | 79.43 | 479741.94 | MACYS EAST 00 02/14 |
| * 2/14/2006 | 2.00 | 479739.94 | NORTH FORK BAN 02/14 |
| * 2/15/2006 | 50000.00 | 429739.94 | WIRE TYPE:WIRE OUT |
| * 2/15/2006 | 23.90 | 429716.04 | CHECKCARD 0214 TWX*AOL |
| * 2/15/2006 | 25.00 | 429691.04 | Wire Transfer Fee |
| * 2/16/2006 | 7000.00 | 422691.04 | Check 1124 |
| * 2/16/2006 | 9500.00 | 413191.04 | Check 1118 |
| * 2/16/2006 | 9500.00 | 403691.04 | Check 1119 |
| * 2/17/2006 | 30.00 | 403661.04 | CHECKCARD 0214 DOUGIES |
| * 2/21/2006 | 972.06 | 402688.98 | Check 1117 |
| * 2/21/2006 | 20000.00 | 382688.98 | Check 1125 |
| * 2/21/2006 | 9999.00 | 372689.98 | Check 1121 |
| * 2/21/2006 | 2631.21 | 370058.77 | Check 1126 |
| .* 2/21/2006 | 100.00 | 369958.77 | BKOFAMERICA ATM 02/19 |
| * 2/21/2006 | 60.00 | 369898.77 | BKOFAMERICA ATM 02/21 |
| * 2/21/2006 | 53.98 | 369844.79 | SOU THE HOME D 02/19 |
| * 2/21/2006 | 45.60 | 369799.19 | SAM'S Club 02/20 |
| * 2/21/2006 | 26.38 | 369772.81 | CHECKCARD 0219 PITA |
| * 2/21/2006 | 15.54 | 369757.27 | SOU THE HOME D 02/21 |
| * 2/22/2006 | 9500.00 | 360257.27 | WIRE TYPE:WIRE OUT |
| * 2/22/2006 | 25.00 | 360232.27 | Wire Transfer Fee |
| * 2/23/2006 | 1250.00 | 358982.27 | CHECKCARD 0222 GA COLON |
| * 2/24/2006 | 9500.00 | 349482.27 | Check 1120 |
| * 2/24/2006 | 8000.00 | 341482.27 | Check 1122 |
| * 2/24/2006 | 3000.00 | 338482.27 | CHECKCARD 0223 NORTHSIDE |
| * 2/24/2006 | 524.00 | 337958.27 | CHECKCARD 0223 NORTH |
| * 2/27/2006 | 18.89 | 337939.38 | CHECKCARD 0226 CHAT |
| * 2/28/2006 | 19127.00 | 318812.38 | Check 1130 |
| * 2/28/2006 | 766.35 | 318046.03 | Check 1127 |
| * 2/28/2006 | 3.00 | 318043.03 | Check Enclosure Fee |
| 3/02/2006 | 5000.00 | 313043.03 | Check 1123 |

*** No More Activity For This Account ***

*Exhibit G*

# STERN, ADLER & WEINSTEIN, LLP

ATTORNEYS AT LAW
1025 Old Country Road, Suite 305
Westbury, New York 11590

---

Tel: (516) 876-1106
Fax: (516) 997-7876
Web Site: www.sawlaw.com
E-Mail: mario@sawlaw.com

Janet S. Stern*
Steven M. Adler
Steven M. Weinstein

* Admitted in N.Y. & N.J.

---

Mario J. DeRossi**

** Admitted in N.Y. &
Mass

August 25, 2006

**VIA FACSIMILE (770) 668-9465**
Segal, Fryer, Shuster & Lester, P.C.
1050 Crown Pointe Parkway
Atlanta, Georgia 30338
Attn: Charles L. Pollack, Esq.

Re:     Sagdiana, LLC and
        Shalom S. Cohen

Dear Mr. Pollack:

Thank you for your letters of August 24, 2006 and August 25, 2006. Please be advised that if and when a closing is scheduled to refinance the loan that it is Mr. Cohen's intent to attend the closing and execute any documents necessary on behalf of the borrower. To that end, this office requires the following:

1. A copy of the loan commitment;

2. Good Faith Estimates and a Truth In Lending Disclosure of all charges to be incurred at closing by the borrower;

3. The identity of the law firm that will be representing the borrower;

4. A proposed schedule of how the loan proceeds will be disbursed.

Moreover, Mr. Cohen has wired $1.5 million dollars to the company previously. I require an accounting of each dollar spent so that it can be determined if the company's resources are being expended properly.

Page Two
Charles I. Pollack, Esq.
August 25, 2006

I note that you have been conspicuously silent on my demand that you provide me with the name of the entity that allegedly purchased the 100 acres or any portion thereof. You previously advised me that the purchase was in a name other than that of Sagdiana or its subsidiaries. I still await that response.

Since I have not received a satisfactory explanation of the events that have transpired, my client has been left no choice but to seek redress in Federal Court. Once we seek and obtain the Temporary Restraining Order we intend to obtain on our clients behalf, service of the same will be made in due course. If the remaining members of Sagdiana then seek to enforce an arbitration clause, they are certainly free to do so. It won't effect the TRO if obtained. Be assured that local counsel has already been consulted for that eventuality. Be further assured that your firm will be disqualified from participating in those proceedings.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Steven M. Weinstein

**Exhibit H**

# PERSONAL GUARANTY

This Personal Guaranty ("Guaranty") is given this ___ day of December, 2005, is made in favor of **SHALOM S. COHEN**, an individual resident of New York (the "Investor") by **MIKHAIL MALLAYEV**, an individual resident of the State of Georgia (the "Guarantor") for the obligations of **SAGDIANA, LLC.**, a Georgia limited liability company (the "Company")

## W I T N E S S E T H:

WHEREAS, Investor and Company have entered into a Membership Interest Purchase Agreement, and Operating Agreement, and certain other documents (the "Transaction Documents") of even date herewith for with respect to the Investor's acquisition of a fifty percent (50%) membership interest in the Company; and

WHEREAS, Guarantor has agreed to guarantee to Investor certain obligations of Company as set forth herein.

NOW, THEREFORE, in consideration of the Investor's entering into the Transaction Documents with Company, and for other valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by Guarantor, Guarantor hereby covenants and agrees with the Investor as follows:

1. <u>Guaranty</u>.  Guarantor guarantees to Investor (a) the payment of the $4,000,000 preferred distribution of Distributable Cash (as said term is defined in the Company's Operating Agreement) described in Section 11.06 of the Company's Operating Agreement, and (b) the return of one hundred percent (100%) of Investor's Capital Contribution (as said term is defined in the Company's Operating Agreement) to the Company.

2. <u>Nature of Obligations</u>. (a) The Guarantor acknowledges and agrees that no change in the nature or terms of the Transaction Documents, whether by operation of law or otherwise, shall discharge all or any part of the liabilities and obligations of the Guarantor pursuant to this Guaranty.

(b) This Guaranty shall remain in full force and effect, and the Guarantor shall continue to be liable in accordance with the terms of the Transaction Documents and this Guaranty, notwithstanding the commencement of any bankruptcy, reorganization or other debtor relief proceedings by or against the Company, and notwithstanding any modification, discharge or extension of the obligations under the Transaction Documents, any modification or amendment of the Transaction Documents, or any stay of the exercise by Investor of any of its rights and remedies against the Company with respect to any of the obligations under the Transaction Documents.

Case 1:06-cv-04830-ARR-SMG   Document 1   Filed 09/06/06   Page 74 of 76 PageID #: 74

3. Term of Guaranty; Warranties. This Guaranty shall continue in full force and effect until all obligations under the Transaction Documents have been fully paid, performed, and discharged.

4. Attorneys' Fees and Costs of Collection. If at any time or times hereafter the Investor employs counsel to pursue collection, to intervene, to sue for enforcement of the terms hereof or of the Transaction Documents, or to file a petition, complaint, answer, motion or other pleading in any suit or proceeding relating to this Guaranty or the Transaction Documents, then in such event, all of the reasonable attorneys' fees and disbursements relating thereto and any other fees and disbursements incurred by or on behalf of the Investor due to the failure of the Company to pay or perform the Transaction Documents when due and payable, shall be an additional liability of the Guarantor to the Investor.

5. No Waivers. No delay or omission by Investor in exercising any of its rights, remedies, powers and privileges hereunder and no course of dealing between Investor, on the one hand, and the Company, the Guarantor or any other person, on the other hand, shall be deemed a waiver by Investor of any of its rights, remedies, powers and privileges, even if such delay or omission is continuous and repeated; nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise thereof by Investor or the exercise of any other right, remedy, power or privilege by Investor. No notice or demand on the Company, the Guarantor or any other person in any instance shall entitle the Guarantor or any other person to any other or further notice or demand in similar or other circumstances or constitute a waiver of Investor's right to any other or further action in any circumstances without notice or demand.

6. Cumulative Rights. All rights of the Investor hereunder or otherwise arising under the Transaction Documents are separate and cumulative and may be pursued jointly, severally, separately, successively, or concurrently, or not pursued, without affecting or limiting any other right of the Investor and without affecting or impairing the liability of the Guarantor.

7. Successors and Assigns. Except as otherwise provided herein, this Guaranty shall be binding upon Guarantor and the successors, heirs, executors, and administrators of Guarantor, and shall inure to the benefit of Investor, Investor's representatives, successors, and assigns. Provided, all principals of Company shall execute a guaranty substantially in the form hereof, the foregoing sentence shall not apply in the event of Guarantor's death.

8. Notices. Notices under this Guaranty shall be given in the same manner as notices under the Transaction Documents. Any notices to Guarantor shall be addressed to Guarantor and sent to the address of the Company.

9. Amendment. This Guaranty may be terminated, amended, supplemented, waived, released or modified only by an instrument in writing signed by the party against whom the

- 2 -

enforcement of the termination, amendment, supplementation, waiver, release or modification is sought.

10.  Governing Law; Severability.  This Guaranty shall be deemed to be a contract made under, and for all purposes shall be construed in accordance with, the laws of the State of Georgia.  Whenever possible, each provision of the Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Guaranty shall be prohibited by or be invalid under such law, such provisions shall be ineffective to the extent of such prohibitions or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

11.  Counterparts; Pronouns; Captions.  This Guaranty may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute but one and the same document.  The pronouns used in this instrument shall be construed as masculine, feminine, or neuter as the occasion may require.  Captions are for reference only and in no way limit the terms of this Guaranty.  All references herein to any document, instrument, or agreement shall be deemed to refer to such document, instrument, or agreement as the same may be amended, modified, restated, supplemented, or replaced from time to time.

IN WITNESS WHEREOF, the undersigned has signed this Guaranty as the date first written above.

_____ (SEAL)
Mikhail Mallayev

DANIEL GABRICC..
No. 01CA6037059
Notary Public, State of New York
Qualified in Nassau County
My Commission Expires 08/18/28

- 3 -

DEC-30-2005   11:59

December 30, 2005

Re:    Shalom S. Cohen ("Cohen") with Mikhail Mallayev ("Mallayev")
Sagdiana, LLC ("LLC")
Premises: Sugar Hill Overlook, Gwinnett County, GA

Whereas Cohen has today executed certain documents for the above referenced transaction,

Whereas certain Members and the Manager of the LLC are not present to execute same where
necessary to complete the transaction,

Whereas Cohen has electronically transferred $300,000.00 pursuant Mallayev's instructions.

Now therefore, it is agreed that Mallayev shall return 2 duplicate original copies of all the
documents to Cohen executed as necessary and notarized no later than January 4, 2005. In the
event that these documents are not received by such time, Cohen shall have the right to rescind
the transaction and Mallayev personally guarantees the return of said $300,000.00 within 24
hours of the rescission.

_____
Mikhail Mallayev

_____
DANIEL CAPPUCCIO
No. 01CA6097059
Notary Public, State of New York
Qualified in Nassau County
My Commission Expires 08/18/200 7

C:\Documents and Settings\Administrator.BEN\My Documents\BZP 1716\Correspondence\Yona Agreement to return dox on Georgia Properties.doc